**TRANSPORTES AEREOS DE ANGOLA, Plaintiff,**

v.

**RONAIR, INC., and Jet Traders Investment Corporation d/b/a Commercial Air Transport Sales, Defendants.**

Civ. A. No. 81–120.

United States District Court, D. Delaware.

Aug. 18, 1982.

F. Alton Tybout of Tybout, Redfearn, Casarino & Pell, P. A., Wilmington, Del., and Michael B. Standard and Emily M. Bass of Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P. C., New York City, for plaintiff, Transportes Aereos de Angola.

Allen M. Terrell, Jr., of Richards, Layton & Finger, Wilmington, Del., and Thomas E. Engel and Michele K. Spike of Hale, Russell & Gray, New York City, of counsel, for defendant Ronair, Inc.

James A. Robb, Wilmington, Del., and Linda K. Raspolich of Abrams, Anton, Robbins, Resnick, Schneider & Mager, P. A., Hollywood, Fla., for defendant Jet Traders Inv. Corp.

## OPINION

LATCHUM, Chief Judge.

In this case of first impression in this Circuit, the Court must decide whether a state-owned corporation of the People's Republic of Angola, a country with which the United States at present maintains no diplomatic relations, is entitled to prosecute a breach of contract action in the courts of the United States. Relying upon a long-standing principle that instrumentalities of foreign governments not recognized by the United States may not have access to its courts, defendant, Ronair, Inc. ("Ronair"), has moved to dismiss the complaint of plaintiff, Transportes Aereos de Angola ("TAAG"). In addition, defendant, Jet Traders Investment Corporation ("Jet Traders"), has moved to dismiss the complaint as to it for lack of in personam jurisdiction. For the reasons discussed in this opinion, the Court concludes that both motions will be denied and that this suit will be allowed to proceed against both defendants.[1]

### I. Background

TAAG is a juridical entity of the Ministry of Transport of the People's Republic of Angola ("Angola"), organized under the laws of Angola, with its principal place of business in the city of Luanda. About May 11, 1979, TAAG entered into a written contract with Jet Traders, a Florida corporation with its principal place of business in Florida, to purchase a Boeing 707-321 aircraft for a price of $7.5 million. Under the terms of the contract, delivery of the aircraft was to be made to TAAG by June 25, 1979 at Wilmington Airport, Wilmington, Delaware.

At the time this contract was executed, title to the aircraft was held not by Jet Traders, but by defendant Ronair. On May 23, 1979, Ronair entered into a contract with a corporation operating under the name of Tekair Limited ("Tekair") to sell the Boeing airplane for a purchase price of $4.98 million. On that same date, Tekair in turn executed an agreement with Jet Traders under which the aircraft was to be sold to Jet Traders for a purchase price of $6 million. These two contracts were to be implemented in such a way that delivery of

---

1. Defendant Jet Traders has also moved to dismiss this suit on the ground that TAAG lacks standing to prosecute its claim in this Court. No memoranda or briefs were filed in support of this motion, however. Because of the Court's denial of Ronair's similar motion to dismiss, which was fully briefed and argued, Jet Traders' motion likewise is denied and will not be separately addressed in this opinion.

the aircraft would be tendered to Jet Traders on or before June 14, 1979, so that Jet Traders could insure delivery to TAAG by June 25, 1979.

The plane was never delivered by Tekair to Jet Traders, and, consequently, Jet Traders did not meet its obligation to deliver the aircraft to TAAG by June 25, 1979. Title to the aircraft, apparently, has continued to reside in Ronair. TAAG, however, claims to have performed all of the conditions for delivery of the plane described in its contract with Jet Traders, including payment to Jet Traders of $6.55 million towards the purchase price. After the June 25, 1979 deadline had passed without the expected delivery, TAAG tendered written notice to Jet Traders that it was terminating the contract and demanded a refund of all monies paid towards the purchase price, together with consequential damages and accrued interest. Jet Traders has refused to comply with this request in any respect.

On July 21, 1979, Jet Traders filed suit in this Court against Tekair claiming breach of contract based on Tekair's failure to deliver the Boeing airplane as provided by the May 23, 1979 agreement. (Jet Traders Investment Corporation v. Tekair Ltd., C.A. 79–363.) Subsequently, on August 9, 1979, Jet Traders filed an amended complaint, adding Ronair as a defendant and further alleging that Ronair and Tekair, both of which are said to be under the dominion and control of the same individuals, conspired to, and did in fact, defraud Jet Traders and illegally interfere with the TAAG contract. TAAG sought leave to intervene in this action under Rule 24, F.R.Civ.P., alleging claims against Ronair, Tekair and Jet Traders. In an opinion dated March 16, 1981, this motion was denied. *Jet Traders Inv. Corp. v. Tekair Ltd.,* 89 F.R.D. 560 (D.Del.1981). Shortly thereafter, on March 24, 1981, TAAG initiated the present suit against Ronair and Jet Traders. Jurisdiction is predicated on diversity of citizenship under 28 U.S.C. § 1332(a)(4).

## II. *Ronair's Motion to Dismiss*

Ronair has moved to dismiss the complaint pursuant to Rule 12(b)(1), F.R.Civ.P., on the ground that TAAG, an agency of a government not recognized by the United States as the true sovereign of the territory it purports to control, does not have standing to pursue its claim in the courts of the United States. Relying on a series of decisions which have refused litigant status to non-recognized governments and certain of their instrumentalities, *see e.g., Republic of Vietnam v. Pfizer, Inc.,* 556 F.2d 892 (C.A.8, 1977); *Federal Republic of Germany v. Elicofon,* 358 F.Supp. 747 (E.D.N.Y.1970), *aff'd,* 478 F.2d 231 (C.A.2, 1973), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1443, 39 L.Ed.2d 489 (1974), and Supreme Court dicta which also has subscribed to this underlying principle, *see Pfizer, Inc. v. India,* 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 564 (1978); *Guaranty Trust Co. v. United States,* 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224 (1938), Ronair argues that this Court is without jurisdiction to adjudicate this dispute. Any contrary holding purportedly would eliminate the fundamental political sanction of non-recognition, and thus undermine the right of the executive branch to control the foreign policy of the United States.

In response, TAAG has raised a number of arguments which may be synthesized as follows. First, TAAG contends that the concept of "recognition," once utilized as an effective weapon by the executive branch in its conduct of international affairs, is no longer considered a viable means of influencing foreign regimes and has for all practical purposes been abandoned by the Department of State. Thus, in keeping with this political judgment, the judiciary likewise should discontinue the practice of denying unrecognized governments access to United States courts. Second, TAAG argues that 28 U.S.C. § 1332(a)(4), which confers diversity jurisdiction on federal courts in cases involving claims brought by foreign states, draws no distinctions between unrecognized and recognized governments. Thus, jurisdiction properly resides in this Court. Third, TAAG asserts that it is a separate and distinct juridical entity whose status must be considered apart from its parent country. Although Angola itself

may be precluded from bringing suit in the courts of the United States, TAAG, as an independent agency, cannot be saddled with this disability. Finally, TAAG argues that because the commercial transaction which is at the heart of this controversy was approved by the Department of Commerce, as reflected in its issuance of an export license for the Boeing aircraft, fairness requires that this suit be allowed to proceed.

During the course of this litigation, the views of the Department of State concerning the propriety of this suit were solicited both by counsel for TAAG and counsel for Ronair. In a letter dated September 28, 1981, addressed to TAAG's counsel, the Deputy Legal Adviser of the State Department conceded that the United States government does not now maintain diplomatic relations with Angola. Nonetheless, he further stated that it was the position of the State Department that TAAG should have standing to prosecute its claim:

DEPARTMENT OF STATE

Washington, D. C. 20520

September 28, 1981

Michael B. Standard, Esquire

Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P. C.

30 East 42nd Street

New York, N. Y. 10017

 Re: *Transportes Aereos De Angola v. Ronair, Inc. and Jet Traders Investment Corporation*

Dear Mr. Standard:

In response to requests from counsel for Transportes Aereos de Angola (TAAG) and from counsel for Ronair, Inc. in the above (sic) referenced litigation, the Department of State is pleased to offer the following information.

The United States does not maintain, and has never maintained diplomatic relations with the People's Republic of Angola. At the same time, the United States Government has not discouraged trade between the United States and Angola. The volume of trade between the two countries in 1980 was $638.6 million,

making the United States one of Angola's largest trading partners. The Export-Import Bank of the United States has granted substantial credits for U. S. exports to Angola.

In these circumstances, the Department of State believes that allowing access to U. S. courts by the Angolan Airline TAAG, a State-owned business enterprise, for the resolution of a claim arising out of a purely commercial transaction, would be consistent with the foreign policy interests of the United States.

   Sincerely,
   James H. Michel
   Deputy Legal Adviser

TAAG argues that two conclusions must be drawn from this letter. First, by purposely avoiding the use of the word "recognition," the letter expressly signals the abandonment of the recognition dichotomy as a vehicle for exerting pressure on foreign governments. Second, and more significantly, the State Department's position that this litigation should be pursued to its logical conclusion must be honored by this Court. Ronair responds, in somewhat circular reasoning, that the refusal of the United States government to recognize Angola is dispositive of the standing issue. Having exercised its discretion to withhold formal recognition from that government, the State Department cannot mitigate the legal consequences flowing from this decision and carve out exceptions to the no-access rule.

The starting point for resolving this hotly disputed issue must be the statute itself. 28 U.S.C. § 1332(a)(4) provides:

The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between—

  *  *  *  *  *  *

(4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

Under 28 U.S.C. § 1603(a), a "foreign state" includes a "political subdivision of a

foreign state or an agency or instrumentality of a foreign state." An "agency or instrumentality of a foreign state" in turn is defined as an entity:

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States ..., nor created under the laws of any third country.

28 U.S.C. § 1603(b).

There is no dispute that TAAG is a corporate entity, and thus separate for purposes of § 1603(a) from the government which created it, that it is wholly owned by the government of Angola, and that it is neither a citizen of a state of the United States nor created under the laws of any third country. The dispute in this case centers on the definition of "foreign state," Ronair claiming that this term includes only political entities recognized by the United States, and TAAG responding that Angola must be considered a "foreign state," for the purposes of this particular litigation.

By its terms, neither § 1603 itself, nor the legislative history of this provision, disclaims any intention to confer federal jurisdiction over suits involving foreign governments not officially recognized by the United States. Nonetheless, § 1603 must be interpreted in light of the deeply embedded federal common law principles extant at the time it was adopted in its present form. Almost since the origins of the federal government, the Supreme Court has acknowledged that *de jure* or *de facto* recognition of a foreign state is a political question to be determined solely by the executive branch. *See e.g., Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410, 84 S.Ct. 923, 931, 11 L.Ed.2d 804 (1964); *National City Bank v. Republic of China*, 348 U.S. 356, 358, 75 S.Ct. 423, 425, 99 L.Ed. 389 (1955); *Jones v. United States*, 137 U.S. 202, 212, 11 S.Ct. 80, 83, 34 L.Ed. 691 (1890).

Simultaneously with the relegation of these judgments to the executive, a parallel principle has emerged that the courts of the United States will not hear suits brought by governments from which official recognition has been withheld. *See Pfizer, Inc. v. India*, 434 U.S. 308, 319–20, 98 S.Ct. 584, 591, 54 L.Ed.2d 563 (1978); *Guaranty Trust Co. v. United States*, 304 U.S. 126, 137–38, 58 S.Ct. 785, 791, 82 L.Ed. 1224 (1938). This practice, however outdated it may seem in light of the commercial realities of current international affairs, has been repeatedly affirmed by the courts. *See e.g., Pfizer, Inc. v. India, supra*, 434 U.S. at 319–20, 98 S.Ct. at 591; *Republic of Vietnam v. Pfizer, Inc.*, 556 F.2d 892, 894 (C.A.8, 1977); *Federal Republic of Germany v. Elicofon*, 358 F.Supp. 747, 750 (E.D.N.Y.1970), *aff'd*, 478 F.2d 231 (C.A.2, 1973), *cert. denied*, 415 U.S. 931, 94 S.Ct. 1443, 39 L.Ed.2d 489 (1974); *Windert Watch Co., Inc. v. Remex Electronics Ltd.*, 468 F.Supp. 1242, 1244 (S.D.N.Y. 1979); *Klausner v. Levy*, 83 F.Supp. 599, 600 (E.D.Va.1949).

The obvious purpose of the judicially made rule denying a forum to unrecognized governments is to give full effect to the decision of the executive branch to refuse to receive that government's diplomatic representatives. As the Supreme Court has observed, "the refusal to recognize has a unique legal aspect. It signifies this country's unwillingness to acknowledge that the government in question speaks as the sovereign authority for the territory it purports to control." *Banco Nacional de Cuba v. Sabbatino, supra*, 376 U.S. at 410, 84 S.Ct. at 931. Any suit brought by a foreign government represents an effort to vindicate rights either of specific citizens or of its citizenry as a whole. *Federal Republic of Germany v. Elicofon, supra*, 358 F.Supp. at 752. Acceptance of a suit in which an unrecognized government sought such vindication would necessarily imply acknowledgment that the government was the legitimate spokesman for the people residing within its borders, a presumption which would encroach upon the executive's exclusive province to formulate foreign policy.

*Id.* Thus, to avoid this "possible incongruity of judicial 'recognition'" in the face of executive non-recognition, the right to bring suit traditionally has been foreclosed to these governments. *Banco Nacional de Cuba v. Sabbatino, supra,* 376 U.S. at 410, 84 S.Ct. at 931.

Perhaps because of the harshness of this rule, certain exceptions have been carved out by the courts. For example, where diplomatic relations have been severed with a government previously recognized by the United States, the privilege of resorting to the courts of this country has not likewise been withdrawn. *See Banco Nacional de Cuba v. Sabbatino, supra,* 376 U.S. at 409–10, 84 S.Ct. at 930–31. In addition, some courts have indicated that separate juridical entities, which are not alter egos of the governments under which they are organized, may maintain suit in United States courts, even though their parent governments would be unable to do so. *See e.g., Amtorg Trading Corporation v. United States,* 71 F.2d 524 (CCPA 1934); *Federal Republic of Germany v. Elicofon, supra,* 358 F.Supp. at 753; *cf. United States v. Insurance Cos.,* 89 U.S. (22 Wall.) 99, 22 L.Ed. 816 (1875); *Banco Para el Comercio v. First Nat. City Bank,* 658 F.2d 913, 918–19 (C.A.2, 1981). *See also* Proposed Restatement Third of Foreign Relations Law (Draft No. 2), § 205, Comment and Reporters' Notes 1 (March 27, 1981). It is this latter exception which has been vigorously pressed upon this Court by TAAG.

It may well be that TAAG, although wholly owned by the Angolan government, is in fact a discrete and independent entity, which should not be subsumed within its parent government for purposes of this suit. The Court need not examine this question, however, because it believes that under the unique facts of this case, there are more compelling reasons why TAAG should be allowed to pursue its claims in this Court.

In those cases in which an instrumentality of an unrecognized government or the government itself has been precluded from adjudicating a legal claim in the courts of the United States, the executive branch ordinarily steadfastly opposed the foreign party's standing to sue, thus leaving the court with no recourse but to give effect to the critical element of non-recognition. In this case, however, not only did the Department of Commerce, in consultation with the Department of State, place its imprimatur on TAAG's commercial dealings with Ronair by issuing a license to export the Boeing aircraft to Angola for TAAG's use, but the State Department itself has unequivocally stated that allowing TAAG access to this Court would be consistent with the foreign policy interests of the United States. Arguably, the Department of Commerce's act in permitting Ronair to transact business with TAAG could in itself be considered a grant of standing to litigate any claim arising out of that transaction in the courts of the United States. *See Federal Republic of Germany v. Elicofon, supra,* 358 F.Supp. at 752, n.4. Considered in conjunction with the express assertion by the State Department that this case should be allowed to proceed, any lingering obstacles to this suit have been conclusively removed.

■ This course is not inconsistent with the constitutional and policy underpinnings of the general rule refusing standing to unrecognized governments nor does it require the Court to abdicate its own role in determining matters of jurisdiction. Foreign nations have long exercised the privilege of suing in United States courts, on the same footing as a domestic corporation or an individual. *See Pfizer, Inc. v. India, supra,* 434 U.S. at 318–19, 98 S.Ct. at 590–91. Other than the disability imposed on unrecognized governments or those governments at war with the United States, nothing in this country's legal history or recorded statutes otherwise precludes foreign governments from seeking legal redress for civil claims in the courts of the United States. *Id.* at 319, 98 S.Ct. at 591. As discussed earlier, moreover, the purpose of denying the privilege of suit to governments not recognized by the executive branch is solely to give full effect to that branch's sensitive political judgments. Thus, where the executive branch, either by

its actions or words, evinces a definite desire to remove the impediment to a suit brought by an unrecognized government, or an instrumentality thereof, that determination necessarily frees this Court from any strictures placed on the exercise of its jurisdiction.

■ Because the executive branch, through the Departments of Commerce and State, has clearly indicated that this suit should be allowed to go forward, defendant Ronair's motion to dismiss will be denied.

## III. *Jet Traders' Motion to Dismiss*

Defendant, Jet Traders, has moved to dismiss this action as to it for lack of in personam jurisdiction. Service of process was effected on Jet Traders under the provisions of the Delaware Long Arm Statute, 10 *Del.C.* § 3104, in accordance with Rule 4(e), F.R.Civ.P. This statute provides in pertinent part:

> (c) As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or his personal representative, who in person or through an agent:
>
> > (1) Transacts any business or performs any character of work in the state;
> > (2) Contracts to supply services or things in this State;
>
> > \* \* \* \* \* \*

In support of its motion to dismiss, Jet Traders asserts that: (1) it is a Florida corporation with its principal place of business in that state; (2) it maintains no office in the State of Delaware, nor does it have an agent for service of process in Delaware; (3) the aircraft agreement between Jet Traders and TAAG, dated May 11, 1979, was executed in Lisbon, Portugal; and (4) none of the negotiations leading up to the aircraft agreement took place in Delaware. Based on these undisputed facts, Jet Traders contends that a sufficient predicate has not been laid under the relevant provisions of § 3104 for the exercise of in personam jurisdiction in this case.

Any inquiry into the propriety of jurisdiction over Jet Traders necessarily involves a two-part process. *Moore v. Little Giant Industries, Inc.*, 513 F.Supp. 1043, 1046 (D.Del.1981). First, the Court must determine, by reference to principles of statutory construction and judicial precedent, whether the Delaware long arm statute in fact provides for the assertion of in personam jurisdiction. If the answer to this question is in the affirmative, the Court must then decide whether the exercise of that jurisdiction would transgress the due process guarantee of fundamental fairness.

■ On its face, the contract between Jet Traders and TAAG would appear to fall squarely within the provisions of § 3104(c)(2). The terms of the agreement expressly provided for delivery of the aircraft to TAAG in Wilmington, Delaware. Thus, by contracting "to supply a thing in this state," Jet Traders made itself amenable under the long arm statute to all suits arising out of that commercial transaction. *See Moore v. Little Giant Industries, Inc., supra,* 513 F.Supp. at 1047–48; *Vinita Broadcasting Co. v. Colby,* 320 F.Supp. 902, 904 (N.D.Okl.1970); *cf. Magid v. Marcal Paper Mills,* 517 F.Supp. 1125, 1130 (D.Del. 1981).

This conclusion comports not only with the literal terms of the statute, but with its underlying purposes as well. The Delaware act is modeled in most material respects on the Uniform Interstate and International Procedure Act, a so-called "single act" statute which allows jurisdiction to be imposed on a non-resident defendant on the basis of a single transaction in, or contact with, the forum state. *Eudaily v. Harmon,* 420 A.2d 1175, 1180 (Del.Supr.1980); *Wilmington Supply Co. v. Worth Plumbing & Heating,* 505 F.Supp. 777, 779–80 (D.Del.1980). Federal courts in this district, moreover, have given an expansive interpretation to the long arm statute, ruling that § 3104 must be construed as conferring jurisdiction to the maximum perimeters of the due process clause. *See Moore v. Little Giant Industries, Inc., supra,* 513 F.Supp. at 1048; *Wilmington Supply Co. v. Worth Plumbing &*

*Heating, supra*, 505 F.Supp. at 780. Based on these guidelines, the application of § 3104(c)(2) would be consistent with the intent of the legislature to exercise jurisdiction over non-residents whenever feasible.

Having determined that the facts of this case fit within the confines of the long arm statute, the Court must next decide whether the exercise of jurisdiction would offend due process. Any such analysis must proceed from the firmly entrenched framework established by *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Due process requires that "if [a defendant] be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* at 316, 66 S.Ct. at 158. Whether sufficient minimum contacts exist cannot be answered by reference to any fixed formula, but must be ascertained from close examination of the particular circumstances of each case. *Wilmington Supply Co. v. Worth Plumbing & Heating, supra*, 505 F.Supp. at 779, *quoting Hutter Northern Trust v. Door County Chamber of Commerce*, 403 F.2d 481, 484 (C.A.7, 1968). If the defendant engaged in some act or conduct by which he may be said to have invoked the benefits and protections of the forum, then it is reasonable and just to require him to litigate a dispute arising therefrom in that state. *International Shoe Co. v. Washington, supra*, 326 U.S. at 319, 66 S.Ct. at 159.

Turning to the circumstances surrounding the TAAG-Jet Traders aircraft agreement, the Court finds that there is ample support for a finding of jurisdiction within constitutional bounds. It is undisputed that the underlying contract, the sale of the Boeing airplane to TAAG, was to be performed entirely within the State of Delaware, that the plane was in fact flown to Wilmington from New York by Tekair sometime before June 1, 1979, for eventual delivery by Jet Traders to TAAG, and that it remained there almost continuously through early August. Apparently, Delaware was chosen as the site for delivery of the aircraft by Ronair and Tekair because of the lack of sales tax on the transfer of personal property. Although Nigel Winfield, an officer of Jet Traders, denied in his deposition that Jet Traders was concerned with possible tax savings and testified that the selection of Delaware for delivery of the plane was thus inconsequential to Jet Traders, there is no doubt that Jet Traders stood to avoid at least $200,000 in taxes by tendering the plane to TAAG in this state.

Winfield also traveled to Wilmington on behalf of Jet Traders on at least six occasions in connection with both the contract between Jet Traders and Tekair, and Jet Traders' contract with TAAG. On at least two of these occasions, Winfield was accompanied by certain Angolan nationals representing TAAG, including a TAAG pilot and different administrative, maintenance and technical personnel, for the purpose of inspecting the aircraft. In addition, Winfield spent at least one additional day in Wilmington for the purpose of performing Jet Traders' responsibilities under its contract with Tekair, *i.e.* making payment on the aircraft, assuming title to the plane, and taking delivery. Although actual performance of these acts never occurred because controversies developed which eventually aborted the sale, this trip is an additional contact which must be factored into the minimum contacts equation.

Finally, it is undisputed that virtually all of Jet Traders' business in the period from April 1, 1979 to September 30, 1979 was related to the purchase from Tekair and subsequent sale to TAAG of the aircraft in Delaware. Jet Traders' quarterly financial statements for this period indicate that the amount on deposit from TAAG towards the purchase price of the plane represented the major portion of Jet Traders' assets, and, if the contract was not consummated and the deposit had to be refunded to TAAG, over 90% of its liabilities. Thus, Jet Traders' economic vitality was dependent to some extent on the performance of this contract in Delaware.

Based on these contacts, it could hardly be considered unfair to expect Jet Traders to defend this suit in Delaware. *See Sumners v. Continental Copper & Steel Industries, Inc.,* 445 F.2d 141, 143 (C.A.10, 1971). Defendant has had sufficient contacts with this state that it can be said to have voluntarily and purposely availed itself of the benefits and protection of its laws. Accordingly, Jet Traders' motion to dismiss this suit as to it for lack of in personam jurisdiction will be denied.

An order will be entered in accordance with this opinion.