## IRAN HANDICRAFT AND CARPET EXPORT CENTER, Plaintiff,

v.

## MARJAN INTERNATIONAL CORPORATION, Defendant.

### No. 84 Civ. 1838 (JMC).

United States District Court,
S.D. New York.

March 17, 1987.

Harvey L. Woll, Wendy E. Reiner, Mannarino, Bader & Bloom, P.C., New York City, for plaintiff.

Ralph A. Matalon, Matalon & Schachter, New York City, for defendant.

CANNELLA, District Judge.

Defendant's motion to dismiss the complaint for lack of subject matter jurisdiction is denied. Fed.R.Civ.P. 12(b)(1).

## BACKGROUND

The facts as stated in the complaint are as follows. Plaintiff Iran Handicraft and Carpet Export Center ["Iran Handicraft"] is in the business of selling for export rugs and carpets from Iran. Iran Handicraft is incorporated under the laws of Teheran, Iran and has a place of business in Beverly Hills, California. Defendant Marjan International Corporation ["Marjan"], a New York corporation, is an importer and seller of rugs and carpets.

In the late summer of 1979, Iran Handicraft agreed to sell and Marjan agreed to buy a quantity of rugs and carpets. Payment for the merchandise was due eight months after the date of invoice. The first

shipment was sent on or about August 8, 1979 and was accompanied by an invoice in the amount of $130,171.00. The second shipment was sent on or about August 25, 1979 and was accompanied by an invoice in the amount of $125,405.00. According to the agreement between Iran Handicraft and Marjan, payment of the total purchase price of $255,576.00 was due on or before April 25, 1980, eight months after the date of the last invoice. Although Marjan acknowledges receipt of the merchandise, payment was never made.

The years 1979 and 1980 were especially turbulent ones in the modern history of Iran. In mid-January 1979, the Shah Mohammed Reza Pahlevi fled the country, leaving behind a successor government in the hands of his prime minister, Shapur Baktiar. By mid-February, this government had collapsed and a revolutionary regime established. The new government, under the tituler leadership of Prime Minister Mehdi Bazargan, was eventually recognized by the United States as the legitimate government of Iran.

The internal political situation inside the country continued to deteriorate, however. Prime Minister Bazargan's government came under increasing pressure from radical elements loyal to the religious leader Ayatollah Ruhollah Khomeini, whose return to Iran from exile in France had been the catalyst for the Shah's downfall. On November 4, militants loyal to Ayatollah Khomeini seized control of the United States Embassy in Teheran and took 52 American diplomatic personnel hostage.

The inability of Iran's government to influence the actions of the militants and the further radicalization of the Iranian revolution led to the collapse of the Bazargan government and its replacement with one even more directly controlled by Ayatollah Khomeini. The United States did not recognize this government. On April 7, 1980, with the embassy and its personnel still in the hands of the militants, the United States severed diplomatic relations with the government of Iran.

Iran Handicraft commenced this breach of contract action on March 15, 1984. An amended complaint was served on July 25. Marjan now moves to dismiss the complaint for lack of subject matter jurisdiction.

## DISCUSSION

As the basis for this Court's subject matter jurisdiction, Iran Handicraft alleges diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2). Section 1332 provides that

(a) the district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between—

. . . . .

(2) citizens of a State and citizens or subjects of a foreign state

. . . . .

28 U.S.C. § 1332(a)(2).

Marjan moves to dismiss on the ground that, because "a foreign state, the government of which has not been recognized by the United States, may not sue as plaintiff in the courts of the United States ... a citizen or subject of such a foreign state may not bring an action here." Defendant's Memorandum in Support of Its Motion to Dismiss at 2, 84 Civ. 1843 (JMC) (S.D.N.Y. Jan. 30, 1986).

The issue presented by Marjan's motion is a narrow one. The parties agree that Iran Handicraft is incorporated under the laws of Iran; therefore, it shall be deemed "a citizen of the entity under the laws of which it is incorporated." *Windert Watch Co., Inc. v. Remex Electronics Ltd.*, 468 F.Supp. 1242, 1244 (S.D.N.Y.1979) (citing *National Steamship Co. v. Tugman*, 106 U.S. (16 Otto) 118, 120–21, 1 S.Ct. 58, 59, 27 L.Ed. 87 (1882)). The sole issue presented by Marjan's motion is whether Iran is a "foreign state" within the meaning of section 1332(a)(2). Because the Court believes that Iran qualifies as a "foreign state" under section 1332(a)(2), Marjan's motion to dismiss the complaint for lack of subject matter jurisdiction is denied.

The starting point for an examination of statutory language is, of course, the language of the statute itself. *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 105

S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985); *Watt v. Alaska,* 451 U.S. 259, 265, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

Section 1332(a)(2) provides for suits between "citizens of a State and citizens or subjects of a foreign state." This language is itself derived from Article III, Section 2 of the United States Constitution, which provides that:

> The judicial Power shall extend to all Cases ... between a State or the Citizens thereof, and foreign States, Citizens or Subjects.

This judicial power has often been referred to as alienage jurisdiction. *Sadat v. Mertes,* 615 F.2d 1176, 1182 (7th Cir.1980). One of the "dominant considerations which prompted the provision for such jurisdiction appear[s] to have been ... [a]pprehension of entanglements with other sovereigns that might ensue from failure to treat the legal controversies of aliens on a national level." *Chang v. Northwestern Memorial Hospital,* 506 F.Supp. 975, 977 n. 1 (N.D.Ill. 1980) (citing *Blair Holdings Corp. v. Rubinstein,* 133 F.Supp. 496, 500 (S.D.N.Y. 1955)).

The language of Article III, section 2 and section 1332(a)(2) does not define what constitutes a "foreign state." However, "[i]t generally has been held that a foreign state is one formally recognized by the executive branch of the United States government." C. Wright & A. Miller, *Federal Practice and Procedure: Jurisdiction 2d* § 3604, at 391 (1984) ["Wright & Miller"]. Furthermore, the term "citizens or subjects of a foreign state" was "designed to include any aliens regardless of the form of government in his country." *Id.* at 394.

Because the Constitution empowers only the President to "receive Ambassadors and other public Ministers," U.S. Const. Art. II, Sec. 3, the courts have deferred to the executive branch when determining what entities shall be considered foreign states.

The recognition of foreign states and of foreign governments, therefore, is wholly a prerogative of the executive branch. *National City Bank v. Republic of China,* 348 U.S. 356, 358, 75 S.Ct. 423, 425, 99 L.Ed. 389 (1955). Thus, it is outside the competence of the judiciary to pass judgment upon executive branch decisions regarding recognition.

■ In order for a foreign state to sue in our courts, both it and the government which represents it must be recognized by the United States. *See Land Oberoesterreich v. Gude,* 109 F.2d 635, 637 (2d Cir.) ("The state must first achieve recognition by our government, ... but once recognized, the foreign sovereign, its subjects and its citizens, including its corporations, may be suitors in our courts."), *cert. denied,* 311 U.S. 670, 61 S.Ct. 30, 85 L.Ed. 431 (1940). Marjan argues that, for purposes of section 1332(a)(2), "[n]on-recognition of a government is [equivalent to] non-recognition of the foreign state or nation it represents, and neither that foreign state or nation *nor its citizens or subjects may bring an action as plaintiff in our courts.*" Affidavit of Ralph A. Matalon, Attorney for Marjan at 4, 84 Civ. 1843 (JMC) (S.D.N.Y. Jan. 30, 1986) (emphasis added). The Court disagrees.

There exists a fundamental distinction between recognition of a state as an international juridical entity and recognition of a particular government. A state is "an entity that has a defined territory and population under the control of a government and that engages in foreign relations." *Restatement (Second) of the Foreign Relations Law of the United States* § 4, at 14 (1965) ["*Restatement*"]; *see also Windert Watch Co.,* 468 F.Supp. at 1244 (for diversity purposes "foreign state" means "a political entity that is recognized by the United States as a free and independent sovereign"). Accordingly,

> Recognition of a new State must not be confused with recognition of a new Head or Government of an old State. *Recognition of a change in the headship of a State, or in the form of its Government, or of a change in the title*

*of an old State, are matters of importance. But the granting or refusing of these recognitions has nothing to do with recognition of the State itself. If a foreign State refuses to recognise a new Head or a change in the form of the Government of an old State, the latter does not thereby lose its recognition as an International Person,* although no official intercourse is henceforth possible between the two States as long as recognition is not given either expressly or tacitly.

1 *Oppenheim's International Law* § 73, at 129–30 (Lauterpacht 8th ed. 1955) ["Oppenheim"] (emphasis added).

While 28 U.S.C. § 1332(a)(4) provides for suits between "a foreign state, ... as plaintiff and citizens of a State or of different States," sound reasons exist for denying access to unrecognized foreign states or governments seeking to sue in federal court. A foreign state can only be represented in its affairs by a government. Thus, any suit brought by a foreign government "represents an effort to vindicate rights of specific citizens or of its citizenry as a whole." *Transportes Aereos de Angola v. Ronair, Inc.,* 544 F.Supp. 858, 862 (D.Del.1982). Nonrecognition of a particular government "is indicative of the refusal of the United States to regard that government as the legitimate spokesman in international affairs for the people it purports to govern." *Federal Republic of Germany v. Elicofon,* 358 F.Supp. 747, 752 (E.D.N.Y.1972), *aff'd,* 478 F.2d 231 (2d Cir. 1973), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1443, 39 L.Ed.2d 489 (1974). To allow an unrecognized government access to our courts would be

the equivalent of an assertion by the court that it acknowledges the right of that government to represent the people of [that foreign state].... A determination of that kind would be inconsistent with the presidential denial of recognition to [that government] and thus be an unconstitutional encroachment upon the power of the President.

*Id.; see also Transportes Aereos de Angola,* 544 F.Supp. at 862–63.

Utilizing the above principles, courts have denied access to unrecognized foreign governments and their political subdivisions. *See, e.g., Republic of Vietnam v. Pfizer, Inc.,* 556 F.2d 892, 894 (8th Cir. 1977) (suit brought by former government of the Republic of South Vietnam dismissed on ground that neither the state nor the government of South Vietnam any longer existed in either law or fact); *Elicofon,* 358 F.Supp. at 756–57 (party seeking to intervene denied access on ground that, in reality, it was a political arm of the government of East Germany, one not recognized by the United States).[1]

In cases involving parties claiming to be citizens of a foreign state, however, courts have focused on whether the foreign state was recognized by the United States as "a free and independent sovereign." *Windert Watch Co.,* 468 F.Supp. at 1244. In *Klausner v. Levy,* 83 F.Supp. 599 (D.C.Va.1949), plaintiff claimed to be a citizen of the state of "Palestine." The court dismissed the action on the ground that "Palestine," a League of Nations mandate territory administered by Great Britain at the time suit was commenced, had not been recognized by the United States as an independent,

---

1. In *Elicofon,* the court held a hearing to determine whether the Weimar Art Collection, the party seeking to intervene in the action, was a private entity or an instrumentality of the government of East Germany. The court wrote:

   If, after a hearing, it is found that the Weimar Art Collection is an arm or instrumentality of the G.D.R., the court will have no choice but to hold that it too is barred from bringing suit. *On the other hand, facts may be developed at the hearing which indicate that the Weimar Art Collection is sufficiently independent of the G.D.R. to be entitled to be free of the latter's disability.*

358 F.Supp. at 753 (emphasis added). Thus, had the court found the Collection to be a private entity, it would have been allowed to intervene as a citizen of a foreign state, despite the fact that the government of East Germany was not recognized by the United States. After the hearing, however, the court found that the Weimar Art Collection had been "performing a governmental function as an arm and agency of the G.D.R.," *id.* at 756, and denied it standing to intervene, *id.* at 757.

sovereign nation. *Id.* at 600; *see also World Communications Corp. v. Micronesian Telecommunications Corp.,* 456 F.Supp. 1122, 1124 (D.Hawaii 1978) (Trust territory administered by United States not foreign state because it was not recognized by United States as an independent sovereign).

In *Murarka v. Bachrack Brothers, Inc.,* 215 F.2d 547 (2d Cir.1954), plaintiffs were citizens of British India and filed their complaint one month before India gained its full independence on August 15, 1947. The court found that although India was not an independent sovereign at the time the action was commenced, the United States had granted it "at least de facto recognition, if not more" by accepting an ambassador from India, whose credentials were signed by the British Crown, and by dispatching an ambassador to India. *Id.* at 552.

In *Windert Watch Co.,* 468 F.Supp. at 1242, defendants were Hong Kong corporations which moved to dismiss the complaint for lack of subject matter jurisdiction. The court granted their motion, finding that Hong Kong was not a "foreign state" within the meaning of the diversity statute, but rather, a colony of Great Britain to which the United States had never granted recognition as an independent state. *Id.* at 1245.

In *Cedec Trading Ltd. v. United American Coal Sales,* 556 F.Supp. 722 (S.D.N.Y. 1983), the court was faced with a plaintiff corporate citizen of the Channel Islands, which lie off the coast of England. The court reviewed the status of the Channel Islands and found that, because the legislature and courts were subject to direct control by the British Government, Parliament's laws were paramount on the island, and because the foreign affairs of the islands were controlled entirely by Great Britain, plaintiff was a citizen of the foreign state of Great Britain. *Id.* at 723. The court distinguished *Windert Watch Co.* on the ground that the Channel Islands had never been considered a colony of Great Britain, but "rather a direct holding of the British crown for over seven hundred years." *Id.* at 724 n. 2.[2]

In *Tetra Finance (HK) Ltd. v. Shaheen,* 584 F.Supp. 847 (S.D.N.Y.1984), the court was faced with a situation similar to that in *Windert Watch Co.* Plaintiffs were Hong Kong corporations seeking to recover on loans made to defendants and never repaid. The court wrote that "[i]t would seem hypertechnical to preclude corporations from asserting claims in our courts simply because Hong Kong has not been formally recognized by the United States as a foreign sovereign in its own right." *Id.* at 848.

The court disagreed with the *Windert Watch Co.* holding, and stated that the "commercial and cultural realities of the modern world dictate that diversity jurisdiction should be granted to certain govern-

---

**2.** In dicta, Judge Owen expressed the opinion that "[c]itizens of foreign states with which our government has no political relations are … outside the definition of 28 U.S.C. § 1332 and [are] unable to sue in our federal courts on the basis of diversity jurisdiction." 556 F.Supp. at 723. Insofar as Judge Owen partly relied on *Murarka* to support this conclusion, the Court again stresses what it believes was overlooked in *Cedec*—the distinction between recognition of a foreign state *qua* state and recognition of a particular government. In *Murarka,* the Second Circuit found that the United States had granted India "at least" de facto recognition by accepting an Ambassador from that country's provisional government. The United States had not formally recognized India or its government as neither actually existed at the time the complaint was filed. Indeed, the Indian Ambassador's credentials were signed by British authorities. It defies logic to deny that an individual is a citizen of a foreign state solely because the state, but not its current government, is recognized by the United States. In the case of newly created states, such as India in 1947 and Israel in 1948, recognition of the state as an international person often goes hand in hand with recognition of the government exercising control over the territory comprising the state. A subsequent withdrawal of recognition of that or another government, as when a change in government is affected through violent or extralegal means, does nothing to negate the underlying recognition that has been accorded to the state. Thus, for example, the United States supports the United Nations' membership of the infamous Pol Pot Government of Kampuchea and thereby denies the legitimacy of the Vietnamese imposed government of Heng Samrin. However, it is unquestioned that the United States continues to recognize Kampuchea as an independent sovereign, despite the current military occupation.

mental entities [like Hong Kong] that have not been [formally] recognized." *Id.* The court nevertheless held that diversity of citizenship existed because the liquidators of the Hong Kong corporations were British citizens. *Id.* at 849.

In *Transportes Aereos de Angola*, 544 F.Supp. at 858, plaintiff was an Angolan state-owned corporation that had purchased an airplane from defendant, a Florida corporation. Although the purchase price was paid, the aircraft was not delivered and plaintiff commenced a breach of contract action in federal court, claiming diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(4). Defendant moved to dismiss on the ground that, because the United States did not recognize the government of Angola, plaintiff, a state-owned corporation, should be precluded from bringing suit. The court denied defendant's motion due to "the express assertion by the State Department that [the] case should be allowed to proceed." *Id.* at 863. In a letter, the State Department had advised that "allowing access to U.S. courts by [the plaintiff], a State-owned business enterprise, for the resolution of a claim arising out of a purely commercial transaction, would be consistent with the foreign policy interests of the United States." *Id.* at 861.

The Court further noted that the Department of Commerce had granted the Angolan corporation a license to export the airplane to Angola and that this "could in itself be considered a grant of standing to litigate any claim arising out of that transaction in the courts of the United States." *Id.* at 863.[3]

With the exception of *Tetra Finance (HK) Ltd.* and *Transportes Aereos de Angola*, Marjan points to the above cases and argues that section 1332(a)(2) requires that both the foreign state itself, as well as its current government, be recognized by the United States. The argument is unpersuasive. In each of the cases discussed above, the court's attention was drawn to the question of whether the United States recognized the entity alleged to be a foreign state as an international juridical person. In the instant case, it is beyond doubt that the United States continues to recognize Iran as an independent sovereign nation, despite the fact that it has withdrawn, or more precisely withheld, recognition of the Khomeini regime.[4] Marjan's

---

3. Like those transactions involved in *Transportes Aereos de Angola*, the ones at issue in the instant case were not prohibited by United States law. Indeed, the two shipments of rugs were made at a time when the United States recognized the revolutionary regime then in power in Iran. *See American Bell International v. Islamic Republic of Iran*, 474 F.Supp. 420, 423 (S.D.N.Y.1979). Only the date upon which final payment was due, April 25, 1980, fell a little more than two weeks after diplomatic relations between the United States and Iran were severed.

4. For purposes of this litigation, Marjan wrote to the Department of State seeking clarification of Iran's diplomatic status. The Department responded as follows:

United States Department of State
Washington, D.C. 20520
December 26, 1985

Ralph A. Matalon
276 Fifth Avenue
New York, N.Y. 10001
Dear Mr. Matalon:
In response to your letter of December 13, 1985, the questions you posed and the answers of the State Department are as follows:

"1. Has the United States recognized the Khomeini government of the Islamic Republic of Iran?"
Answer: No.
"2. Did the United States sever diplomatic relations with Iran? If so, on what date were they served [sic], and have they been re-established since that date?"
Answer: Diplomatic relations with Iran were severed by the United States on April 7, 1980, and have not been re-established.
Sincerely,
K.E. Malmborg /s/
K.E. Malmborg
Assistant Legal Advisor for Management

The response of the State Department serves to underscore the Court's reliance on the distinction between recognition of a foreign state and recognition of a particular foreign government. The letter above merely reiterates that the United States does not recognize the current regime in Teheran as the legitimate successor to the Shah's regime. Presumably, this position is based on legal and political considerations, with the latter likely outweighing the former. Nevertheless, the letter does not indicate that the United States has sought to withdraw its recognition of Iran as an independent nation.

argument that nonrecognition of a government is equivalent to nonrecognition of the state itself is simply not supported by either the language of the statute, the above line of cases interpreting that language, the policy underlying denial of access to unrecognized foreign governments, or by fundamental principles of international law regarding the distinction between recognition of a state and recognition of a government.

Recognition of foreign governments, though perhaps inspired by a mixture of legal and political considerations, remains essentially a political act, which the executive branch alone is empowered to undertake. Thus, "the purpose of denying the privilege of suit to governments not recognized by the executive branch is solely to give effect to that branch's sensitive political judgments." *Transportes Aereos de Angola,* 544 F.Supp. at 863. Once the United States recognizes an entity as a sovereign state, however, a subsequent withdrawal of recognition of that state's government does not effect a change in the underlying recognition of the state as an international juridical entity. *See Restatement* § 96 Comment b, at 310 *("Withdrawal of recognition of states.* No instance has been found where recognition of a state has been withdrawn except as an incident to its disappearance, as in the case of its absorption into another state."); *Oppenheim* § 75g, at 151–52 (discussing how, in 1938, Great Britain withdrew its recognition of Abyssinia [today Ethiopia] as an independent state by granting de jure recognition to the annexation of that country by Italy).

It is the Court's view that section 1332(a)(2) requires it only to determine whether the foreign state, of which the party claims citizenship, is recognized by the United States as an international juridical person. The rationale for denying access to our courts is simply not implicated when a private citizen of a recognized foreign state seeks vindication of individual rights related to a purely commercial dispute with a citizen of the United States.

For all of the foregoing reasons, the Court holds that, despite the fact that the current government in Iran is not recognized by the United States, Iran is a "foreign state" within the meaning of 28 U.S.C. § 1332(a)(2).

### CONCLUSION

Defendant's motion to dismiss the complaint for lack of subject matter jurisdiction is denied. Fed.R.Civ.P. 12(b)(1). The trial date for this action is set for April 13, 1987.

SO ORDERED.