860 F.2d 551
 1989 A.M.C. 9
 NATIONAL PETROCHEMICAL COMPANY OF IRAN, Plaintiff-Appellant,
v.
The M/T STOLT SHEAF, her engines, boilers, etc., Posiden
Navigation, Inc., Parcel Tankers, Inc., Stolt
Nielsen, Inc., and Stolt Nielsen A/S,
Defendants- Appellees.
 No. 1005, Docket 87-9022.
 United States Court of Appeals,
Second Circuit.
 Argued April 26, 1988.
Decided Oct. 31, 1988.
 
 Richard D. Gaines, New York City, for plaintiff-appellant.
 Brian D. Starer, New York City (Charles B. Anderson, Richard A. Menchini, Don P. Murnane, Jr., Haight, Gardner, Poor & Havens, New York City, Charles L. Black, Jr., New York City, of counsel), for defendants-appellees.
 Joan E. Hartman, U.S. Dept. of Justice, Civ. Div., Washington, D.C. (Michael F. Hertz, U.S. Dept. of Justice, Civ. Div., Michael G. Kozak, Acting Legal Adviser, Ronald J. Bettauer, Asst. Legal Adviser, Sean D. Murphy, Attorney-Adviser, U.S. Dept. of State, James M. Spears, Acting Asst. Atty. Gen., Washington, D.C., Rudolph W. Giuliani, U.S. Atty., New York City, of counsel), filed a brief on behalf of the U.S. as amicus curiae.
 Before CARDAMONE, PRATT and MAHONEY, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 The sole question presented on this appeal is whether National Petrochemical Company of Iran (NPC), a foreign corporation wholly owned by the government of Iran, is entitled to bring suit as a plaintiff in a diversity action in federal court. To answer such a question in this shoalstrewn area of the law, it is wise for courts to have in mind, like doctors taking the Hippocratic oath, that they must "first, do no harm." For the reasons that follow, we hold that NPC may maintain its action in the courts of the United States.
 
 
 2
 * A brief background is necessary. In November of 1979 militants loyal to the Ayatollah Khomeini seized the United States Embassy in Tehran and took 52 American diplomatic personnel hostage. With the embassy and its personnel still in the militants' hands, on April 7, 1980 President Carter severed diplomatic relations with Iran and issued Executive Order No. 12,205, 45 Fed.Reg. 24,099 (1980), barring the sale to it of American products. As a result, NPC--which is a subsidiary of the National Iranian Oil Company that in turn is wholly owned by the government of Iran--found itself unable to procure essential chemicals such as ethylhexanol, orthoxylene, and ethylene dichloride from its usual sources in the United States. NPC's attempts to circumvent President Carter's trade embargo resulted in the transactions that brought about the instant litigation.
 
 
 3
 In the spring of 1980, NPC agreed to buy the needed chemicals from Monnris Enterprises (Monnris) of Dubai, United Arab Emirates. Monnris arranged to purchase them from Rotexchemie Brunst & Co. of Hamburg (Rotex), which contracted with United States sellers through its Geneva affiliate, Formula, S.A. (Formula). Rotex and Formula apparently fabricated shipping documents that concealed both the origin of the chemical cargo and its destination, and by such illegal methods were able to draw on the letters of credit issued by NPC before the cargoes were even shipped.
 
 
 4
 In August, 1980 Rotex chartered the defendant M/T Stolt Sheaf from the Liberian defendant Parcel Tankers, Inc. to carry the chemicals from Houston, Texas to Iran, via Barcelona, Spain. The remaining defendants are United States and Norwegian companies affiliated with Parcel Tankers and the M/T Stolt Sheaf. Rotex planned to deliver the embargoed goods to NPC in Iran, but when war broke out between Iran and Iraq in September, 1980 the chemicals were diverted to Taiwan, where Rotex resold them.
 
 
 5
 NPC thereupon instituted civil and criminal suits against the middlemen in Hamburg and Rotterdam to recover the losses it incurred in its scheme to skirt the American trade embargo. Because these suits were unsuccessful, plaintiff filed a complaint on September 30, 1986 in the United States District Court for the Southern District of New York (Owen, J.) alleging that the above named defendants had participated with the middlemen in fraud, conversion, falsifying bills of lading, all in breach of their duties and obligations under the bills of lading and the law. In a published decision, 671 F.Supp. 1009 (S.D.N.Y.1987), Judge Owen concluded--based upon a United States State Department letter written in connection with an unrelated case, Iran Handicraft & Carpet Export Center v. Marjan Int'l Corp., 655 F.Supp. 1275 (S.D.N.Y.1987)--that the United States has not recognized the Khomeini government of Iran. The district court therefore held that because NPC is a wholly-owned entity of an unrecognized foreign government, it is not entitled to bring suit in the courts of the United States. It dismissed NPC's complaint with prejudice. 671 F.Supp. at 1010.
 
 
 6
 On NPC's appeal from dismissal of its complaint, the United States has, for the first time, entered the litigation, submitting a brief as Amicus Curiae signed by attorneys from the Justice and State Departments, urging that NPC be granted access to the courts of the United States in this case.
 
 II
 
 7
 We turn to an analysis of the law. Article III of the United States Constitution extends the federal judicial power to "all Cases ... between a State, or the Citizens thereof, and foreign States, Citizens or Subjects." U.S. Const., art. III, Sec. 2, cl. 1. To effectuate this power, the United States Judicial Code provides diversity jurisdiction over any civil action arising between "a foreign state ... as plaintiff and citizens of a State or of different States." 28 U.S.C. Sec. 1332(a)(4) (1982).
 
 
 8
 To determine whether NPC as a wholly-owned entity of the Khomeini government of Iran should be granted access to federal court under Sec. 1332(a)(4), it is helpful to review several well-established rules in this area of the law. In order to take advantage of diversity jurisdiction, a foreign state and the government representing it must be "recognized" by the United States. See Pfizer Inc. v. India, 434 U.S. 308, 319-20, 98 S.Ct. 584, 591-92, 54 L.Ed.2d 563 (1978); Calderone v. Naviera Vacuba S/A, 325 F.2d 76, 77 (2d Cir.1963); Land Oberoesterreich v. Gude, 109 F.2d 635, 637 (2d Cir.), cert. denied, 311 U.S. 670, 61 S.Ct. 30, 85 L.Ed. 431 (1940). As an incident to the President's express constitutional powers to appoint, U.S. Const., art. II, Sec. 2, and to receive ambassadors, id. Sec. 3, and to his implied power to maintain international relations, United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 318-20, 57 S.Ct. 216, 220-21, 81 L.Ed. 255 (1936), the Supreme Court has acknowledged the President's exclusive authority to recognize or refuse to recognize a foreign state or government and to establish or refuse to establish diplomatic relations with it. See Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 410, 84 S.Ct. 923, 930, 11 L.Ed.2d 804 (1964); Guaranty Trust Co. v. United States, 304 U.S. 126, 137, 58 S.Ct. 785, 791, 82 L.Ed. 1224 (1938); see also Restatement (Third) of the Foreign Relations Law of the United States Sec. 204 (1987) (Restatement 3d ).
 
 
 9
 For our purposes in this case, we also note that, under international law, a "state" is generally defined as "an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with other such entities." Restatement 3d Sec. 201; see Texas v. White, 74 U.S. (7 Wall.) 700, 720, 19 L.Ed. 227 (1868). Although international law purports to require recognition of "states" that satisfy the elements of this definition, recognition of the particular government in control of another state is not mandatory. Further, a state derecognizes a governmental regime when it recognizes another regime as the legitimate government of that state. For example, when the United States recognized the People's Republic of China it derecognized the regime of the Taiwanese "Republic of China" which the United States had previously treated as the Chinese government. See Restatement 3d Sec. 203, Comment f.
 
 
 10
 A break in diplomatic relations with another government does not automatically signify denial of access to federal courts. See Sabbatino, 376 U.S. 408-12, 84 S.Ct. 929-31. As the Supreme Court has observed, courts are hardly competent to assess how friendly or unfriendly our relationship with a foreign government is at any given moment, and absent some "definite touchstone for determination, we are constrained to consider any relationship, short of war, with a recognized sovereign power as embracing the privilege of resorting to United States courts." Id. at 410, 84 S.Ct. at 931; see Pfizer Inc., 434 U.S. at 319-20, 98 S.Ct. at 591-92. With these general rules in mind, we consider the circumstance of the instant case.
 
 III
 
 11
 A. Recognition For Purposes of Federal Diversity
 
 Jurisdiction
 
 12
 The United States, as noted, severed diplomatic relations with Iran in 1980. In addition, NPC and Amicus concede that the President has never formally recognized the Khomeini government of Iran. The district court relied on a letter from the Assistant Legal Advisor for Management of the Department of State clarifying Iran's diplomatic status in connection with Iran Handicraft & Carpet Export Center v. Marjan Int'l Corp., 655 F.Supp. 1275 (S.D.N.Y.1987). The letter, dated December 26, 1985, stated in part:
 
 
 13
 In response to your letter of December 13, 1985, the questions you posed and the answers of the State Department are as follows:
 
 
 14
 "1. Has the United States recognized the Khomeini government of the Islamic Republic of Iran?"
 
 
 15
 Answer: No.
 
 
 16
 Id. at 1280 n. 4. Amicus contends that this response referred merely to the absence of formal recognition and was not intended to foreclose courts from entertaining suits by the Khomeini regime. NPC and Amicus argue that the Executive Branch has not prohibited the Khomeini regime's access to federal courts, and that the Executive Branch may recognize a government for the purposes of bringing suit despite the absence of formal recognition.
 
 
 17
 Appellees assert, to the contrary, that unlike diplomatic relations, the President's formal statement of recognition of a foreign government is a necessary condition to permitting it to sue in federal court. Certain language in the Supreme Court's decisions arguably supports such a requirement. See, e.g., Sabbatino, 376 U.S. at 410, 84 S.Ct. at 931 ("[T]he refusal to recognize has a unique legal aspect. It signifies this country's unwillingness to acknowledge that the government in question speaks ... for the territory it purports to control.") (citations omitted); Guaranty Trust, 304 U.S. at 137, 58 S.Ct. at 791 ("[I]n conformity to generally accepted principles, the Soviet Government could not maintain a suit in our courts before its recognition by the political department of the Government."). Thus, appellees urge that NPC must be denied access to federal court based on the President's failure to extend formal recognition to the Khomeini government. We disagree and hold that the absence of formal recognition does not necessarily result in a foreign government being barred from access to United States courts.
 
 
 18
 Two reasons support this holding. First, as this century draws to a close, the practice of extending formal recognition to new governments has altered: The United States Department of State has sometimes refrained from announcing recognition of a new government because grants of recognition have been misinterpreted as pronouncements of approval. See 77 State Dep't Bull. 462-63 (Oct. 10, 1977) ("In recent years, U.S. practice has been to deemphasize and avoid the use of recognition in cases of changes of governments...."); Restatement 3d Sec. 203, reporter's note 1 (commenting on recent deemphasis of formal recognition). As a result, the absence of formal recognition cannot serve as the touchstone for determining whether the Executive Branch has "recognized" a foreign nation for the purpose of granting that government access to United States courts.
 
 
 19
 Second, the power to deal with foreign nations outside the bounds of formal recognition is essential to a president's implied power to maintain international relations. Cf. United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 318-20, 57 S.Ct. 216, 220-21, 81 L.Ed. 255 (1936). As part of this power, the Executive Branch must have the latitude to permit a foreign nation access to U.S. courts, even if that nation is not formally recognized by the U.S. government. This is because the president alone--as the constitutional guardian of foreign policy--knows what action is necessary to effectuate American relations with foreign governments. Cf. Sabbatino, 376 U.S. at 411 n. 12, 84 S.Ct. at 931 n. 12 (citing criticisms of any policy which would mandate formal recognition before a foreign nation could sue in U.S. courts).
 
 
 20
 This case serves as an excellent example. Relations between the United States and Iran over the past eight years have been less than friendly. Yet, the status of that relationship has not been unchanging. There have been periods of improvement, for example, release of the embassy hostages, and periods of worsening relations, most recently occasioned by the unfortunate downing of an Iranian civilian airliner by the U.S.S. Vincennes. It is evident that in today's topsy-turvy world governments can topple and relationships can change in a moment. The Executive Branch must therefore have broad, unfettered discretion in matters involving such sensitive, fast-changing, and complex foreign relationships. See Guaranty Trust, 304 U.S. at 137, 58 S.Ct. at 791 ("What government is to be regarded here as representative of a foreign sovereign state is a political rather than a judicial question, and is to be determined by the political department of the government."); Sabbatino, 376 U.S. at 410, 84 S.Ct. at 931 ("This Court would hardly be competent to undertake assessments of varying degrees of friendliness or its absence...."); Curtiss-Wright, 299 U.S. at 319, 57 S.Ct. at 220 ("In this vast external realm, with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation.").
 
 B. Deference to the Executive Branch
 
 21
 Determining that formal recognition is not necessary for Iran to gain access to U.S. courts does not end our inquiry. We must also consider whether the Executive Branch--despite its withholding of formal recognition--has evinced a willingness to permit Iran to litigate its claims in the U.S. forum. Several facts persuasively indicate such a willingness. For example, Iran and the United States entered into the Algerian Accords to resolve the embassy personnel hostage crisis; an ongoing Iran-United States Claims Tribunal at the Hague continues to adjudicate disputes between the two countries; and the 1955 Treaty of Amity, Economic Relations and Consular Rights between the United States and Iran remains in full force and effect. Standing alone, none of these indicia of Executive Branch willingness to allow Iran to proceed as a plaintiff in the United States courts would necessarily persuade us to reverse the district court and grant access. Considering these factors in the aggregate, and not in isolation, as integral components of the United States overall relationship to Iran, the above recited connections strongly suggest that the Executive Branch has evinced an implicit willingness to permit the government of Iran to avail itself of a federal forum.
 
 
 22
 It is unnecessary to go further in examining other treaties, documents, or ties in order to ascertain the Executive Branch's intentions regarding Iran's access to the federal courts. The United States has submitted a Statement of Interest pursuant to 28 U.S.C. Sec. 517 (1982) stating that "it is the position of the Executive Branch that the Iranian government and its instrumentality should be afforded access to our courts for purposes of resolution of the instant dispute." Because this Statement was not filed with Judge Owen, he was not apprised of the Executive Branch's position prior to ruling.
 
 
 23
 Appellees protest that for us to defer to what they term an "ad hoc, pro hac vice" directive to allow NPC's suit will encourage arbitrary and unpredictable pronouncements on the status of foreign governments, but we need not reach that question here because there is no indication that this is an arbitrary or ad hoc directive. This is not a case where the Executive Branch is attempting to prohibit a formally recognized government from bringing a single suit in the United States courts, nor is it a case where the Executive is arbitrarily allowing some suits by an unrecognized nation while disallowing others. Rather, here the Executive Branch--after entering into treaties with Iran, after establishing a claims tribunal to adjudicate disputes between the two countries, and after complying with U.S.-Iran agreements--expressly entered this case as Amicus requesting that Iran be given access to our courts. Under such circumstances, and as the sole branch authorized to conduct relations with foreign countries, the Executive clearly did not act arbitrarily. Accordingly, we hold that, for all the reasons stated, NPC must be permitted to proceed with its diversity suit in the Southern District of New York.
 
 IV
 
 24
 The judgment of the district court dismissing NPC's complaint is reversed, the complaint is reinstated and the matter is remanded to the district court for further proceedings.