**TARBERT TRADING, LTD., Plaintiff,**

v.

**COMETALS, INC., Defendant.**

No. 84 Civ. 3512 (BN) (GLG).

United States District Court,
S.D. New York.

June 17, 1987.

Lee A. Pollock, White Plains, N.Y., for plaintiff.

Baer Marks & Upham, New York City by Eugene R. Scheiman, Deborah R. Linfield, for defendant.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge, United States Court of International Trade, sitting as a District Court Judge, by designation:

### Introduction

This diversity case, tried to the court,[1] has as its genesis a February 1984 contract between the parties covering the sale by plaintiff's South African agent to defendant of approximately 2000 metric tons of Kenyan red haricot beans, 1982 crop ("the beans"), warehoused in Rotterdam, Holland. Plaintiff seeks to recover damages of $227,628.00 (subsequently reduced to $172,000.00) arising out of the alleged breach of contract by defendant, who refused to take delivery of the beans predicated on their allegedly poor quality.

Defendant denies any breach of contract on its part claiming that plaintiff failed to tender beans that conformed to the quality of certain samples previously submitted to defendant and to the quality specifications agreed upon by the parties in their contract. Accordingly, defendant seeks by counterclaim to recover damages of $54,000.00 for plaintiff's alleged breach of contract. Alternatively, defendant maintains that the agreement should be declared void and unenforceable because plaintiff could not, except through fraud or forgery, comply with its agreement to supply defendant with a European Economic Community ("EEC") certificate of origin for the Kenyan beans stating that they were of the origin of a member of the EEC.

For the reasons set forth below, the court finds in plaintiff's favor on the issue of quality; but agrees with defendant's argument that the contract of sale is void for illegality predicated on the parties' agreement concerning the furnishing of a false EEC certificate of origin for the Kenyan red beans.

### The Facts

#### I.

Tarbert Trading, Ltd. ("Tarbert") is a commodities trading corporation formed under the laws of the United Kingdom of England and Wales, with its principal place of business in Geneva, Switzerland. Agrimen Trading (Pty) Ltd. ("Agrimen") is a South African corporation engaged in commodities trading which acted as an agent for Tarbert in connection with the sale of the beans at issue in this case (Tr. 14). Cometals, Inc. ("Cometals") is a New York corporation engaged in commodities trading and was the purchaser of the beans.

The Kenyan red beans had been purchased by Tarbert from Agrogen S.A. ("Agrogen") in July 1983 (Exh. 1), and during the period of time relevant to this case were stored in the warehouse of Van Bennekum's Havenbedrijf B.V. ("Van Bennekum's") in Rotterdam, Holland. On or about January 18, 1984, Agrimen and Cometals instituted a series of telephone and telex exchanges [2] which culminated in a sale of the beans to Cometals and the signing of a letter agreement dated February 22, 1984 by Mr. Benas Levy on behalf of Tarbert and by Mr. Horacio Herzberg on behalf of Cometals (Exh. 27).

#### II.

In a telephone conversation on the evening of February 22, 1984, plaintiff's employee, Mr. Gram Rooke (acting on behalf of Levy) and defendant's Herzberg agreed upon the terms of sale for the beans. In the course of that conversation, Herzberg gave Rooke *specific wording* concerning

---

1. Subsequent to trial and with the court's permission, the parties conducted further discovery; and filed post-trial findings of fact and conclusions of law, with additional memoranda.

2. The communications were principally between Horacio Herzberg, then Cometals' Vice President, and Benas Levy, Agrimen's Managing Director.

an EEC certificate of origin, which certificate Levy had earlier in the day agreed by telephone to furnish to Cometals. The oral agreement of February 22, 1984 between Rooke and Herzberg was subsequently confirmed by a telex of February 23, 1984 sent by Agrimen to Cometals (Exh. 30).

Rooke's confirming telex of February 23, 1984 (Exh. 30) specified with regard to the EEC certificate of origin: "SELLERS WILL SUPPLY A CERT OF ORIGIN ISSUED BY A CHAMBER OF COMMERCE *STATING THAT GOODS ARE ORIGIN OF A COUNTRY WHICH IS AN EEC MEMBER*" (emphasis added). The parties' letter agreement (Exh. 27) incorporated essentially the same provision for an EEC certificate of origin.

Herzberg told Rooke in their telephone conversation of February 22, 1984 that he (Herzberg) required such an EEC certificate of origin containing specific wording, *viz.,* the beans "are of the origin of an EEC member" (Tr. 183). Although Herzberg did not disclose to Rooke the reason why Herzberg required an EEC certificate of origin, Rooke understood that the purpose for obtaining such certificate was that Herzberg would show it to some third person (Tr. 186). Both Rooke and Herzberg understood that it was impossible to honestly furnish the specified certificate since the sale concerned Kenyan red beans. Nonetheless, Rooke agreed to comply with the specific phraseology insisted upon by Herzberg (Tr. 187–190).[3]

It appears that Herzberg requested an EEC certificate of origin stating that the Kenyan beans were of the origin of a member of the EEC because the beans had been sold by Cometals in a "back-to-back" agreement to International Grain Trade, Inc. ("International Grain") for shipment to Colombia (Exhs. 24, 32). Colombia, however, would not permit the importation of beans from Kenya; without the EEC certificate of origin, International Grain could not import the beans into Colombia, and hence without obtaining the certificate of origin from Tarbert, Cometals "could never have done the transaction" (Herzberg Dep. Tr. 81, 86–9).

An EEC certificate of origin stating that the goods are of the origin of an EEC member would be understood by anyone reading it that the beans were *grown* in an EEC country (Tr. 325–27, 437) and that was concededly Herzberg's understanding of the term "origin" (Herzberg Dep. Tr. 87–88). Herzberg had insisted upon being furnished with such false certification as an essential part of the agreement to purchase the beans and Rooke agreed to furnish such certificate. The final agreement of sale containing the provision for the EEC certificate of origin in the language specified by Herzberg was signed by both plaintiff and defendant (Exh. 27).[4] It should be noted that Exhibit 27, prepared by Cometals on its letterhead, does not describe the commodity sold as Kenyan red beans, but simply as "Small red beans, 1982 crop." However, from communications regarding the sale (Exhs. 9, 14, 17, 23, 24, 30, 31, 40), Herzberg admittedly understood that the commodity Tarbert intended to sell and covered by the contract was Kenyan red beans (Tr. 546, Herzberg Dep. Tr. 40).

---

3. The provision for an EEC certificate in Exhibit 27 also appears in a letter of agreement (Exh. 31) that was prepared by Ms. Susan Bennett, plaintiff's secretary in charge of contract administration, which letter followed the identical terms set forth in Rooke's confirmatory telex of February 23, 1984 (Exh. 30). The letter agreement prepared by Bennett was *signed* by Tarbert, but not by Cometals. The subsequent letter agreement prepared by Cometals (Exh. 27) was signed by both parties. Exhibit 27, signed by Levy on behalf of Tarbert and by Herzberg on behalf of Cometals, constitutes the parties' contract as finally consummated after a series of communications by telephone and telex (Tr. 431).

4. Rooke's confirming telex of February 23, 1984 referred to Tarbert's supplying a certificate "stating that the goods are origin of a country which is an EEC member." The court sees no distinction of substance between that phraseology and the wording in the letter agreement prepared by Cometals (Exh. 27), which referred to the seller supplying a certificate of origin "stating goods are of EEC Member." Regardless of which phraseology is used, the language does not suggest simply that a certificate be issued by an EEC member or that the goods be shipped from an EEC country. The plain English understanding of the phraseology, as conceded by Levy, is that the goods were grown or produced in an EEC country (Tr. 325–27, 437).

In April 1984, Levy commented to Rooke that the provision in the contract for an EEC certificate of origin was inconsistent with the description of the goods and that it was a pity that Rooke had used such phraseology (Tr. 187). Bennett also expressed dismay concerning the EEC certificate provision of the contract, since she too was aware that Kenya was the country of origin. However, Tarbert agreed to the certificate of origin provision notwithstanding it was "inconsistent with the facts," since it was "requested and expected" by Herzberg (Tr. 187–88, 194).

Both Tarbert and Cometals were well aware that it was not possible to honestly obtain from a Chamber of Commerce or furnish to a third party a certificate that the Kenyan beans were "origin" of an EEC member, since South Africa is not a member of the EEC (Tr. 181, 190–91). The EEC certificate of origin actually obtained by Tarbert (Exh. A) shows that Kenya is the country of origin; but it fails to contain the false phraseology required by Herzberg and agreed upon in the contract (Tr. 144).

In sum, what was requested by Cometals and agreed to be furnished by Tarbert was a false EEC certificate of origin. It is evident from Herzberg's deposition that such false certificate of origin was intended to be used to mislead the Colombian customs officials concerning the country of origin of the beans (Herzberg Dep. Tr. 86–9).

Under the contract, delivery of the beans was to take place in March 1984, either by the purchaser giving the seller 15 days preadvice as to the nomination of a vessel and the beans would thereupon be shipped F.O.B. stowed vessel Rotterdam, or if the buyer failed to nominate a vessel in March 1984, delivery would be ex-warehouse Rotterdam.[5]

The parties' contract lists the documents that Tarbert agreed to furnish to Cometals in connection with the transaction. These documents, somewhat inaptly listed under "Shipping documents," include: commercial invoice, ocean bill of lading, EEC certificate of origin, phytosanitary certificate, weight and quality certificates, and a warehouse receipt if the beans were lifted ex-warehouse. Respecting the warehouse receipt, the contract states (Exh. 27, item F under "Shipping documents"): "Should goods *not be shipped* in March sellers to *include* warehouse receipt." (emphasis added). Obviously, then, characterization of all the documents listed in items A through F as "shipping documents" is a misnomer and not indicative of the parties' intent as to the documents to be furnished if the beans were lifted ex-warehouse. Tarbert was willing to furnish all of the documents specified in the contract, but significantly, was unable to furnish Cometals with a legitimate EEC certificate of origin stating that the beans were origin of a member of the EEC, as specifically contracted by the parties (Tr. 50, 90, 115–16, 126–27, 130). Under Exhibit 27, if Cometals had lifted ex-warehouse, Tarbert would have been obligated to furnish all the documents listed, except an ocean bill of lading (Tr. 205, 331–33).

### III.

We turn to the parties' agreement concerning the quality of the beans.

Although Agrimen furnished Cometals with samples of the beans (Exh. 16, Tr. 21–22), the contract makes no reference whatsoever to samples,[6] but instead specifically provides that the quality be: "Sound, loyal and merchantable, max. 1 pct impurities, free from live and practically free

---

**5.** Cometals never nominated a vessel, and of course, the beans were never shipped to Cometals (Tr. 288).

**6.** On or about January 23, 1984, Cometals requested from Tarbert and received from Van Bennekum's a 500 gram sample of the beans (Exhs. 9, 10). On February 14, 1984, Agrimen offered by telex (Exh. 19) to sell the beans "APPROX AS PER SAMPLE," but this offer was

not accepted (Tr. 35–36). Subsequently, a second sample was furnished to Cometals (Tr. 37). However, further negotiations between the parties made no reference to either of the samples sent to Cometals. Therefore, samples were relevant to the contract only as "an indication of the type of beans that were offered," *viz.*, appearance of the beans and their general quality (Tr. 485).

from dead weevils" (Exh. 27). Additionally, the parties agreed that the quality of the beans would be certified by an independent surveyor, Internationale Controle Maatschappij (I.C.M.) B.V. (an affiliate of Societe Generale de Surveillance (Nederland) B.V.) (hereinafter referred to as "S.G.S."), and that the S.G.S. certification would be "final." *Id.* In short, the beans were not sold by plaintiff "as per sample" (Tr. 87).

S.G.S., a nationally recognized company in the Netherlands, surveys and attests to the quality of goods (Tr. 18). Concededly, S.G.S. is an expert and qualified surveyor (Herzberg Dep. Tr. 74–75). On March 27 and 31, 1984, S.G.S. issued quality certificates concerning the beans at issue, certifying:[7]

> Inpurities ... nil
> The sample is free from alive weevils and practically free from dead weevils
> Sound, loyal and merchantable

S.G.S. also found 0.8 per cent "holed" beans (insect damage) and the presence of a small amount of insect eggs (Exhs. 53, 59).[8]

The term "sound" in the contract means that the commodity is not rotten or moldy (Tr. 50); "loyal" means that the commodity conforms to the norms for a particular crop year, country of origin and type of commodity (Tr. 49–50); "merchantable" means that the commodity is saleable and fit for human consumption (Tr. 49).

"Holed" beans, *viz.*, beans with holes in them caused by weevil damage (Tr. 97), are rarely absent from a consignment of beans from Africa; and a consignment containing 0.8 per cent holed beans are sound and merchantable (Tr. 99, 242). Further, the presence of holed beans, although indicative of previous weevil infestation, is not inconsistent with the beans being presently free from live weevils (Tr. 98). The presence of holed beans is common in a consignment of beans from Kenya and is not considered as an "impurity" (Tr. 97–98, 166, 242, 369). Importantly, the parties' contract does not prohibit the presence of holed beans.

Insect eggs are a form of impurity in commodities (Tr. 98, 243, 260, 367, 371–72, 511), are not a form of live weevils (Tr. 99, 162, 243), and are common in Kenyan red beans (Tr. 97–98, 242, 369). The presence of insect eggs is not inconsistent with the beans being "sound, loyal and merchantable" (Tr. 97–100, 243).

The beans also contained "split" beans, which are common in Kenyan beans (Tr. 173, 243). A "split bean" is a bean that has broken into several pieces due to deterioration or drying out (Tr. 243, 463). The presence of some split beans in a consignment of Kenyan beans has no effect on the soundness, loyalty or merchantability of the beans (Tr. 244).

As we have noted, the parties' agreement provides that S.G.S.' certification is "final" (Exh. 27, Tr. 26). Cometals understood that the S.G.S. certificates were final regarding the quality of the beans (Herzberg Dep. Tr. 74), and the certificates establish that the quality of the beans conformed to the quality requirements of the contract.

While on a business trip in Europe on March 20, 1984, Herzberg and Juan Pira-

---

7. The inspection covered by the March 27, 1984 certificate was made at the request of Cometals, while the inspection covered by the March 31, 1984 certificate was made at the request of Tarbert.

8. On September 27, 1983, S.G.S. had issued a certificate of quality in connection with Tarbert's purchase of the beans from Agrogen certifying: impurities were nil; the beans were free from alive weevils and practically free from dead weevils. No mention was made of holed beans or insect eggs (Exh. 3). S.G.S. did not indicate the presence of holed beans in its certificate of September 27, 1983 because it was not requested to show that specific information (Tr. 337).

S.G.S. does not make reference to specific matters relating to quality, such as holed beans, in its report unless requested to do so by the party ordering the inspection (Tr. 250). A party would not request S.G.S. to certify as to such specific matters as insect eggs unless the party had contracted to sell the commodity with specific reference to such matter (Tr. 250, 428). That was not the case regarding the contract here. If S.G.S. finds insect eggs to be present, but has not specifically indicated that finding separately on its certificate, insect eggs could be included under "impurities" (Tr. 260, 428).

quive, President of International Grain (to whom Cometals had contracted to sell the beans) inspected the beans at the Van Bennekum's warehouse in Rotterdam. Based upon that inspection, Cometals advised Tarbert by telex (Exh. 45) that Cometals was rejecting the beans since its inspection had revealed "extensive weevil damage" that did "not reflect the same quality as per representative samples" sent to Cometals (Tr. 87).

Following Cometals rejection of the Kenyan red beans warehoused at Van Bennekum's as "non-contractual material," Cometals expressed a willingness to ·accept a "good quality" tender of red beans conforming to the requirements of the contract and offered to extend the time provisions of the contract (Exhs. 47, 54). Tarbert, however, did not tender other beans (Tr. 444, 446).

After rejection of the beans by Cometals and extensive efforts by Tarbert to resell the beans, they were sold by Agrimen to Agrogen, from whom they had originally been purchased. Ultimately, the beans were resold to the EEC and to a canner. The only complaints arising from the resale concerned the number of split beans (Exh. 92, Tr. 118, 247–49).

In connection with the sale to Agrogen, S.G.S. again inspected the beans in July 1984 and certified that the beans contained "Splits—1.8 per cent." S.G.S.' July 1984 inspection report (Exh. 124) found that "Foreign matter and weeviled beans combined" totalled only 0.5 per cent, well under the 1 per cent limitation on impurities the parties had agreed upon in the contract involved in this case (Exh. 27). The 1.8 per cent "splits" (pieces of broken beans) are not a form of impurity. S.G.S. also certified that the beans were "sound, fair average quality" (Exh. 124).

### Opinion

Plaintiff contends that defendant breached the contract at issue since defendant wrongfully refused to accept the beans as failing to conform to the quality requirements of the contract. Further, argues plaintiff, since defendant failed to nominate a vessel by March 15, 1984, the contract did not require plaintiff to furnish defendant with an EEC certificate of origin.

Defendant maintains that plaintiff breached the contract in that the tendered Kenyan red beans failed to comply with the quality requirements of the contract due to the presence of weevil damage and insect eggs. Defendant also advances the argument that whether or not a vessel was nominated by March 15, 1984, the contract required plaintiff to furnish a false EEC certificate of origin stating that the beans were of the origin of an EEC member, and that such agreement was an essential and inseparable part of the parties' contract. Inasmuch as a certification by a Chamber of Commerce that the Kenyan beans had an EEC country of origin could have been obtained only by fraud or forgery, defendant urges that the contract was illegal and hence unenforceable.

### I.

■ We first address the issue concerning conflict of laws. As to that matter, the court agrees with the contention of Tarbert that the law of New York is applicable in this case rather than the law of the Netherlands, as urged by Cometals. The court has considered various facts: Cometals resides in New York; negotiations took place between Cometals in New York and Agrimen in South Africa; the formal letter agreement (Exh. 27) was prepared by Cometals in New York; and the physical location of the beans in Rotterdam was not a significant factor in the parties' transaction. In short, the transaction between Tarbert and Cometals "bears an appropriate relation to this state [New York]." *See* U.C.C. Section 1–105. However, in view of the result reached in this case, it is immaterial whether the law of the Netherlands or of New York is applied.[9]

---

9. Cometals insists that the court should apply the Uniform Law on the International Sale of Goods (ULISG) and the Uniform Law on the Formation of Contracts for the International

Sale of Goods (ULFCISG), which is the law Cometals argues would be applied by a court sitting in the Netherlands. However, as pointed out by Tarbert, under Article 1, § 1 of the UL-

## II.

Although not dispositive in this case, the court finds for plaintiff on the quality issue, which will be briefly discussed.

The contract between Tarbert and Cometals clearly provides that the certification by S.G.S. would be final as to the quality of the beans. At his deposition, Herzberg conceded that Exhibit 27 reflected his intention that S.G.S. be the final arbiter relative to the quality of the beans (Herzberg Dep. Tr. 74).

■ Predicated upon S.G.S.' certificates (Exhs. 53 and 59), the court finds that the beans conformed to the contract. The presence of the small amount (.8 per cent) of "holed" beans and insect eggs was not inconsistent with the quality standards agreed upon by the parties. The quality standards at issue, which appear in defendant's own draft of the contract (Exh. 27), did not specifically prohibit the presence of insect eggs or holed beans, both of which Levy testified without contradiction are quite common in Kenyan beans.

Cometals argues that the beans did not conform to the contractual specifications since it is claimed that an S.G.S. certificate dated July 11, 1984 (Exh. 124) shows impurities of 2.7 per cent. However, defendant overlooks that the 2.7 per cent figure includes "splits" of 1.8 per cent which plainly are not impurities, but merely beans which have broken into several pieces (Tr. 173, 243).

Whether or not the beans conformed with the samples submitted to Cometals during the preliminary negotiations is not a controlling factor in this case since the relevant quality standards were contractually specified by the parties. Significantly, the contract makes no reference whatever to samples. If, as argued by Cometals, the beans necessarily had to conform to the samples, then the salient provision in the contract pertaining to the finality of S.G.S. certificates was totally meaningless.

Defendant's reliance upon Article 33 of the ULISG (even assuming that the ULISG is applicable) is not relevant in this case where the parties' contract was not based on samples, but expressly upon the quality specifications set forth in the contract.[10] Further, the fact that Cometals may have chosen to resell the beans to International Grain by sample cannot alter Cometals' contract with Tarbert concerning the quality specifications agreed upon.

## III.

■ Although the court agrees with Tarbert's position on the quality issue, the court must agree with Cometals' contention that the contract is void inasmuch as the EEC certificate of origin could not have been obtained or furnished by plaintiff without committing an illegal or tortious act.

Under the law of the Netherlands a contract that calls for the doing of an illegal or tortious act is absolutely void and unenforceable. *See* Martindale-Hubbell, *Netherlands Law Digest,* p. 5 (1985). Moreover, insofar as New York law is concerned:

It is the settled law of this State (and probably of every other State) that a party to an illegal contract cannot ask a court of law to help him carry out his illegal object, nor can such a person plead or prove in any court a case in which he, as a basis for his claim, must show forth his illegal purpose ... For no court should be required to serve as paymaster of the wages of crime, or referee between thieves. Therefore, the law "will not extend its aid to either of the parties" or "listen to their complaints against each other, but will leave them where their own acts have placed them."

*Stone v. Freeman,* 298 N.Y. 268, 271, 82 N.E.2d 571, 572 (1948) (citations omitted). *See also McConnell v. Commonwealth*

ISG and ULFCISG, both laws are inapplicable in this case since Cometals' place of business is in the United States, which is not a contracting State.

10. Agrimen's offer to sell the beans approximately as per sample (Exh. 19) was rejected by Cometals, and forms no part of the agreement between the parties as finally consummated in Cometals' letter agreement (Exh. 27).

*Pictures Corp.,* 7 N.Y.2d 465, 469, 199 N.Y.S.2d 483, 485, 166 N.E.2d 494 (1960).

Concededly, both Tarbert and Cometals were cognizant of the fact that an EEC certificate of origin stating that the Kenyan beans were of the origin of an EEC member would be false and would be shown to third persons. The essence of Herzberg's deposition testimony is clear that he required the certificate of origin with the specific phraseology conveyed to Mr. Rooke so that the Kenyan beans could be imported into Colombia by International Grain, since Colombia would not permit the importation of Kenyan beans. Simply put, Herzberg intended to deceive the Colombian customs officials with a false certificate as to the beans' country of origin so that they would allow the importation of the beans by Cometals' customer, International Grain. Herzberg admitted at his deposition that without the certificate of origin, defendant could not have consummated the "back to back" deal with International Grain who intended to import the beans into Colombia.[11]

Irrespective of the rather incredible explanations of plaintiff's witnesses Rooke and Levy as to what they understood to be the purport of the requested certificate of origin, all of plaintiff's witnesses finally and grudgingly conceded that an EEC certificate stating that the goods were of the origin of an EEC member would be understood by anyone reading it to mean that the beans were grown in an EEC country and not simply shipped from such country (Tr. 325–27, 437). Consequently, it is completely understandable why both Levy and Bennett expressed shock, dismay and disapproval of the oral agreement concerning the EEC certificate between Rooke and Herzberg, which was nonetheless subsequently confirmed by Rooke's telex and ultimately by the parties' letter agreement (Exh. 27).[12] The fact that such letter agreement drafted by Cometals duplicitously described the subject commodity simply as "Small red beans, 1982 crop," rather than as "Kenya red haricot beans crop 1982" as described in Rooke's confirming telex of February 23, 1984 (Exh. 30), does not avoid the illegality of the contract inasmuch as both parties understood from the prior communications and intended that the Kenyan beans stored in Van Bennekum's warehouse were the subject of the contract (Herzberg Dep. Tr. 40).

It is evident from the Kenyan origin of the beans that it would have been impossible for Tarbert to honestly obtain from a Chamber of Commerce and furnish Cometals with a bona fide EEC certificate of origin stating that the goods were of the origin of a member of the EEC since concededly Kenya is not an EEC member.[13] Thus, the only way in which Tarbert could have complied with the agreement would have been to convince an official of a Chamber of Commerce to issue a fraudulent certificate or to obtain a forged certificate.[14] Both acts are obviously illegal.

No one shall be permitted to profit by his own fraud, or take advantage of his own

---

**11.** Interestingly, Herzberg resigned from Cometals on September 4, 1984 and became employed by Mr. Piraquive at International Grain (Herzberg Dep. Tr. 16).

**12.** As noted *supra,* in April 1984 Levy stated to Rooke that the provision in the contract for an EEC certificate of origin was inconsistent with the description of the goods and that it was a pity that Rooke had used such phraseology (Tr. 187). Ms. Bennett testified that the contract language with respect to the EEC certificate was "stupid" at best, but that Agrimen made no effort to change or renegotiate the agreement, which required Tarbert to supply the country of origin documentation that it knew it could not legally obtain (Tr. 318–19).

**13.** An EEC certificate of origin obtained by Tarbert after Cometals rejected tender of the Kenyan beans (Exh. A) indicates that Kenya was the country of origin, but the certificate does not conform to the phraseology agreed upon by the parties in their contract, which required the certificate to state that an *EEC member* was the country of origin of the beans. Further, to the extent that Exhibit A can be read to state that Kenya is an EEC member, the certificate was false.

**14.** It is also apparent that other import documentation which normally would be presented to customs officials, such as a phytosanitary certificate and commercial invoice would, to be consistent with the false EEC certification of origin, have to conceal the Kenyan origin of the beans.

wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime. These maxims are dictated by public policy, have their foundation in universal law administered in all civilized countries, and have nowhere been superseded by statutes.

*McConnell v. Commonwealth Pictures Corp., supra,* 7 N.Y.2d at 469, 166 N.E.2d at 496, 199 N.Y.S.2d at 485, quoting *Carr v. Hoy,* 2 N.Y.2d 185, 187, 158 N.Y.S.2d 572, 574–75, 139 N.E.2d 531, 533 (1957).

Plaintiff maintains that the furnishing of the EEC certificate of origin was a non-essential and separable part of the bargain, and that therefore the court may hold only that portion of the agreement unenforceable. However, the court finds that the illegality is inseparable from and goes to an essential ingredient of the bargain between the parties, because Cometals insisted upon the EEC certificate in the requested form with an eye to its back-to-back sale of the beans to International Grain and a surreptitious importation of the beans into Colombia. Plainly, enforcement of the agreement for either party would be contrary to public policy. In *Dalton, Dalton, Little, Inc. v. Mirandi,* 412 F.Supp. 1001 (D.N.J.1976), the court aptly commented:

> If the contract is illegal, it is the policy of the law to leave the parties where it finds them, and to deny relief to both sides ... In some respects, the question has sometimes turned on whether the illegal provision, *by the terms of the bargain,* has a specific consideration apportioned to it; but even in such cases the contractual apportionment will not save the agreement if the illegal portion is an essential part of the contract as a whole.... The test of the rule is that if it appears that there would have been no contract made without the illegal portion, then the striking of it strikes out the entire contract.

*Id.* 1003 (emphasis in original). *See also Williston on Contracts,* § 1748 (Jaeger 3d ed. 1972) (Agreements made with a view of violating the laws of another country will not be enforced).

The fact that Tarbert agreed to furnish the certificate of origin without knowledge of the specific purpose for which Cometals required the certificate is without avail to Tarbert since it knew that the certificate could not honestly be obtained and that the false certificate would be shown to some third person. Similarly, Cometals' contention that its intent in the matter was innocent and that it was not in *pari delicto* is patently frivolous.

Finally, in view of Tarbert's arm's length and voluntary agreement to furnish Cometals with an EEC certificate of origin stating that the beans were of the origin of an EEC member in the face of Tarbert's knowledge that the beans were of Kenyan origin, the court sees no basis whatever for the application of the principles of equitable estoppel, or "good faith" as between merchants, or the doctrine of unconscionability as advanced by Tarbert. *See* U.C.C. §§ 1–203, 2–103 and 2–302.

For the foregoing reasons, the complaint and counterclaim herein are dismissed. Each party is to bear its own costs.

The foregoing constitutes the court's findings of fact and conclusions of law in accordance with Rule 52(a), Fed.R.Civ.P. The Clerk of the court shall enter judgment pursuant to Rule 58 Fed.R.Civ.P. providing that the complaint and counterclaim are dismissed.