NATIONAL PETROCHEMICAL CO. OF
IRAN, Plaintiff,

v.

The M/T STOLT SHEAF, et
al., Defendants.

No. 86 Civ. 7505.

United States District Court,
S.D. New York.

Oct. 4, 1989.

Richard D. Gaines, New York City, for
plaintiff.

Haight, Gardner, Poor & Havens, New
York City (Brian D. Starer, Charles B.
Anderson, Richard A. Menchini, Don P.
Murnane, Jr., of counsel), for defendants.

## MEMORANDUM AND ORDER

OWEN, District Judge:

This case is but one of the many consequences of Iran's having seized 52 American hostages in November, 1979. While Americans remained hostage and in retaliation for Iran's role in the hostage situation, President Carter by executive order embargoed exports from the United States of certain chemicals. Desperate for United States supplies, the plaintiff, National Petrochemical Co. ("NPC"), an instrument of the Iranian government, tried to circumvent the embargo "by entering into an illegal scheme to purchase the needed chemicals through a series of middlemen...." *National Petrochemical Co. of Iran v. The M/T Stolt Sheaf,* 860 F.2d 551, 552 (2d Cir.1988). Because of the outbreak of the Iran–Iraq War, the disguised and illegal shipment never arrived in Iran, and one of the middlemen, Rotexchemie Brunst & Co. ("Rotex"), successfully resold the chemicals in Taiwan.

In this action, NPC seeks to recover the value of the cargo from the ship owners, who made the M/T Stolt Sheaf available to the middlemen for shipment of the chemicals from Houston to Barcelona and from Barcelona to Iran, alleging that the shipping interests negligently and conspiratorially permitted Rotex to divert the chemicals. Previously, relying on the then-opposition of the United States Department of State, I dismissed the action because the United States had not recognized the Iranian government, and consequently United States courts were closed to Iran and its instrumentalities. 671 F.Supp. 1009 (S.D. N.Y.1987). While NPC's appeal of that dismissal was pending before the Second Circuit, the State Department rethought its

position as to just this case, urging that "the Iranian government and its instrumentality should be afforded access to our courts for purposes of resolution of the instant dispute." As a result, the Second Circuit reversed the initial dismissal, holding that access was not barred.[1]

▇ Now on remand, the defendants again move to dismiss or for summary judgment on all claims, arguing that NPC may not seek recovery of losses sustained in its knowing efforts to violate United States law. Because public policy forbids courts to aid parties in their attempts to recover on illegal contracts, dismissal on that ground is mandated. "[A] party to an illegal contract cannot ask a court of law to help him carry out his illegal object, nor can such a person plead or prove in any court a case in which he, as a basis for his claim, must show forth his illegal purpose...." *Stone v. Freeman*, 298 N.Y. 268, 271, 82 N.E.2d 571, 572 (1948). Agreements with alien enemies during wartime, agreements that would violate foreign or forum laws, and agreements against the public policy of the forum, are all unenforcable. Williston on Contracts 3d Ed., §§ 1747, 1748, 1752. The use of agents to effectuate such agreements does not alter their illegality. *See Tarbert Trading, Ltd. v. Cometals, Inc.*, 663 F.Supp. 561 (S.D.N.Y.1987); Williston, § 1747 n. 3.

▇ The agreement at issue in this case was illegal under the laws of the United States and Iran,[2] and under the laws of other jurisdictions involved. This illegality was recognized by the Second Circuit in its recent opinion, 860 F.2d at 552, in which the Court observed that the bills of lading pertaining to this shipment of chemicals had been forged to show false origin and destination. Moreover, this falsification was within the knowledge and with the consent of NPC's agents. Kunhi Mohamed, the proprietor of Monnris Enterprises, which was admittedly NPC's agent

(Complaint at ¶ 18), has stated that "potential Iranian purchasers, as well as would-be suppliers for Iran, were looking for middlemen through whom contracts could be raised, *so as to circumvent the effect of the trade sanctions applying to Iran*" (Mohamed Affidavit, pp. 1–2, emphasis supplied). Mohamed also asserts that his effort was to supply chemicals to NPC despite the embargo, that he knew the German company through which he secured the chemicals was using an assumed non-German name so as to avoid disclosing likely violations of German law, and that NPC established letters of credit in favor of this fictitious German company. Moreover, Mohamed learned that the chemicals had originated in the United States, to be reloaded in Barcelona, Spain for their trip to Iran. Mohamed also saw that the bills of lading misdesignated the ships and points of origin. After Mohamed notified NPC of the actual illegal point of origin, NPC lifted the remaining restrictions on the letters of credit. Defendants' Motion to Dismiss, Exh. F. It is clear that Monnris knew that the transaction would involve violations of United States and Iranian law, told NPC what he knew and, together with NPC, proceeded with the illegal transaction.

NPC seeks to avoid the bar of illegality by contending that Monnris' knowledge should not be imputed to it and that the transaction, as NPC knew it, violated no law. Neither argument has merit. First, one Asghar Bakhtiari, then the head of NPC's Procurement Department, states in his affidavit that Monnris was NPC's agent. Second, that Bakhtiari understood the illegality of the deal is clear:

> Another term of sale was that third party bills were to be acceptable. I understood this to mean that Monnris Enterprises, although the sellers of the cargo to us, would not be shown as the shippers in the Bills of Lading. I also under-

---

1. Nothing in its opinion suggests that the Court of Appeals even considered the issue of the contract's illegality as a possible bar to this action, let alone sought to preclude its assertion.

2. In response to the American embargo on sales of certain goods to Iran, Iran outlawed the purchase of American products. Thus, NPC, an Iranian government instrumentality, also violated its own laws when it attempted to secure these American chemicals.

**56**

stood that the bills would not necessarily reflect the true destination for the cargo, since they would originally show that the cargo was to be discharged for the account of Monnris and our identity as the final receiver and Bandar Khomeni as the Port of Discharge would not necessarily be mentioned. *Obviously this might be necessary in order to avoid any regulations giving effect to the economic sanctions* (emphasis supplied).

Defendants' motion to dismiss, Exh. H, p. 4.

In the face of these admissions of NPC's agent and its employee, NPC's knowledge of the transaction's illegal purpose and the illegal arrangements necessarily made to have it succeed, is undisputed, and, therefore, NPC cannot now recover for any damages flowing therefrom. Accordingly, defendants' motion for summary judgment is granted, and the action is dismissed with costs and disbursements.

So ordered.