930 F.2d 240
 1991 A.M.C. 1890, 19 Fed.R.Serv.3d 923
 NATIONAL PETROCHEMICAL COMPANY OF IRAN, Plaintiff-Appellant,
v.
The M/T STOLT SHEAF, her engines, boilers, etc., Posiden
Navigation, Inc., Parcel Tankers, Inc., Stolt
Nielsen, Inc., Stolt Nielsen A/S,
Defendants-Appellees.
 No. 1036, Docket 89-9132.
 United States Court of Appeals,
Second Circuit.
 Argued March 29, 1990.
Decided April 11, 1991.
 
 Richard D. Gaines, New York City, for plaintiff-appellant.
 Brian D. Starer, New York City (Charles B. Anderson, Richard A. Menchini, Don P. Murnane, Jr., Haight, Gardner, Poor & Havens, New York City, of counsel), for defendants-appellees.
 Before OAKES, WINTER and MAHONEY, Circuit Judges.
 MAHONEY, Circuit Judge:
 
 
 1
 In this action, plaintiff-appellant National Petrochemical Co. of Iran ("NPC") seeks damages from defendants for failure to deliver certain chemicals originally destined for Iran aboard the vessel Stolt Sheaf, but ultimately discharged at Taiwan after the outbreak of war between Iraq and Iran. Defendants are the tanker Stolt Sheaf, on which the chemicals in question were shipped from Houston, Texas, and various parties engaged in the ownership and operation of the Stolt Sheaf.
 
 
 2
 Upon remand from a decision by this court in National Petrochemical Co. of Iran v. M/T Stolt Sheaf, 860 F.2d 551 (2d Cir.1988), cert. denied, 489 U.S. 1081, 109 S.Ct. 1535, 103 L.Ed.2d 840 (1989) ("NPC I "), that affirmed the right of NPC to maintain this action in American courts, the United States District Court for the Southern District of New York, Richard Owen, Judge, granted summary judgment to defendants. The district court ruled that NPC was barred from recovery because of its knowing efforts to violate United States law imposing an embargo upon the sale or other transfer of items, products, and commodities (other than excepted food, medical supplies and clothing) to Iran. See National Petrochemical Co. of Iran v. M/T Stolt Sheaf, 722 F.Supp. 54 (S.D.N.Y.1989) ("NPC II "). The district court denied a subsequent motion by NPC to vacate the summary judgment and allow NPC to amend its complaint.
 
 
 3
 We affirm.
 
 Background
 
 4
 On April 7, 1980, in response to the seizure by Iranian militants of the United States embassy in Tehran and the taking of fifty-two American diplomatic personnel as hostages, President Carter severed diplomatic relations with Iran and issued Executive Order 12205, 45 Fed.Reg. 24,099 (1980). The order proscribed, inter alia, "[t]he sale, supply or other transfer, by any person subject to the jurisdiction of the United States, of any items, commodities or products ... from the United States ... either to or destined for Iran," with certain exceptions not presently pertinent. Id.
 
 
 5
 In June 1980, NPC, the parent company and purchasing agent for a number of Iranian subsidiaries, and a subsidiary that purchased for its own account, Abadan Petrochemical Company, sought to purchase supplies of certain urgently needed chemicals, ethylhexanol ("EH"), orthoxylene ("OX"), and ethylene dichloride ("EDC"), for delivery to Iran. The mutual trade embargoes existing between the United States and Iran[1], however, rendered NPC's prior sources unavailable. NPC therefore approached various traders and brokers in order to secure new sources of supply.
 
 
 6
 NPC contracted with a middleman, Monnris Enterprises ("Monnris") of Dubai, United Arab Emirates, to purchase NPC's requirements of EH and OX. Monnris proceeded to secure the needed chemicals from Rotex Chemie Brunst & Co. of Hamburg, West Germany ("Rotex"). Rotex acted in this transaction, however, through a Swiss affiliate, Formula S.A., because West Germany, like the United States, had placed restraints on shipments to Iran.
 
 
 7
 Although the pertinent documents called for shipment of the EH and OX from "Any West European & UAE Ports," the EH and OX, as well as supplies of EDC for Abadan Petrochemical Company, were in fact purchased from suppliers in the United States and shipped from Houston, Texas aboard the Stolt Sheaf. Although the original charter party called for delivery of the cargo from Texas to Barcelona, Spain, a subsequent addendum to that charter party specified Iran as the ultimate destination of the cargo.
 
 
 8
 In September 1980, war broke out between Iran and Iraq. Defendants notified NPC of their invocation of the war risk clause of the charter party and their concommitant request that the charterer, Rotex, name an alternate destination for the cargo aboard the Stolt Sheaf, which by then was in the vicinity of Iran. Thereafter, by a second addendum to the charter party, Rotex ordered defendants to redirect the Stolt Sheaf to Taiwan, where Rotex successfully resold the cargo.
 
 
 9
 The sale in Taiwan was purportedly for the account of NPC, but NPC was unable to obtain the proceeds from Rotex and Formula. In resulting legal proceedings in Germany, Kuhn Mohamed, the proprietor of Monnris at the time of this transaction, stated in an affidavit that Monnris' relationship with NPC in this transaction resulted from the following situation:
 
 
 10
 1980 was ... the time of the Iranian revolution and potential Iranian purchasers, as well as would-be suppliers to Iran, were looking for middle-men through whom contracts could be raised, so as to circumvent the effect of the trade sanctions applying to Iran. For my firm, and in general for all trading firms in Dubai, this was a very promising commercial opportunity....
 
 
 11
 Mohamed also acknowledged that he knew by August 21, 1980, approximately a month before their intended delivery to Iran, that the Stolt Sheaf was bringing the chemicals from the United States, "but that the vessel would be calling at Barcelona where new bills of lading would be issued either for that vessel or for another one."
 
 
 12
 Ashgar Bakhtiari, head of NPC's procurement department in 1980, also submitted a statement in the German proceedings which included the following with respect to the transaction at issue:
 
 
 13
 Another term of sale was that third party bills were to be acceptable. I understood this to mean that Monnris Enterprises, although the sellers of the cargo to us, would not be shown as the shippers in the Bills of Lading. I also understood that the Bills would not necessarily reflect the true destination for the cargo, since they would originally show that the cargo was to be discharged for the account of Monnris and our identify [sic] as the final receiver and Bandar Khomeni as the Port of Discharge would not necessarily be mentioned. Obviously, this might be necessary in order to avoid any regulations giving effect to the economic sanctions.
 
 
 14
 Emphasis added. Bakhtiari also asserted that "during the time of the economic sanctions applying to trade with Iran after the revolution, it was impossible in most cases to contact [manufacturers of raw materials] direct and we had to work through agents and middle men."
 
 
 15
 On September 30, 1986, NPC commenced this action, claiming that defendants negligently and conspiratorily allowed Rotex to divert and resell the chemicals. Paragraph 18 of NPC's complaint alleged that "NPC or its agents, including Monriss [sic]" had contracted with Rotex for the delivery of the chemicals. The district court initially dismissed the complaint on the ground that NPC's status as a wholly-owned entity of the unrecognized Iranian government prevented its suing in a United States court, but this court, at the urging of the United States as amicus curiae, reversed that determination in NPC I.
 
 
 16
 Upon remand, defendants moved to dismiss the complaint on the grounds that NPC sought to recover on an illegal contract and that its claim was time-barred. The district court granted summary judgment for defendants on the former ground, finding that "[t]he agreement at issue in this case was illegal under the laws of the United States and Iran." NPC II, 722 F.Supp. at 55. The court concluded that NPC was barred from recovery because its "knowledge of the transaction's illegal purpose and the illegal arrangements necessarily made to have it succeed ... [was] undisputed." Id. at 56. The court's opinion granting summary judgment included a statement that Monnris "was admittedly NPC's agent." Id. at 55. The district court subsequently denied a motion by NPC to vacate the summary judgment and allow NPC to amend its complaint to delete the reference to Monnris as NPC's agent.
 
 
 17
 This appeal followed.
 
 Discussion
 
 18
 On appeal, NPC presents three grounds for reversal: 1) the contracts that NPC seeks to enforce were not illegal; 2) there was a material factual issue as to whether NPC was in pari delicto with regard to any illegality; and 3) the district court abused its discretion when it denied NPC's motion to vacate the judgment and to allow amendment of the complaint. We consider each of these contentions in turn.
 
 
 19
 A. Illegality of Contracts.
 
 
 20
 NPC claims that the contracts at issue in this suit were legal because the individual agreements, viewed separately, were not subject to the embargoes against shipments from the United States to Iran. Executive Order 12205, by its terms, applies to "any person subject to the jurisdiction of the United States." Thus, NPC contends that because Formula and Monnris were not subject to United States jurisdiction, their contracts to supply goods to Iran were outside the scope of the embargo. Similarly, it claims, the defendants, as foreign entities, could properly contract to make the shipments.
 
 
 21
 It is very doubtful, to begin with, that foreign entities which undertake to deliver goods from a United States port in violation of American law are not, in doing so, "subject to the jurisdiction of the United States." In any event, this reasoning ignores the undisputed fact that each contract was a component, in the words of NPC's complaint, of a "scheme to transport the cargoes for payment of monies between the U.S. and Iran, without detection in contravention of the then existing laws and trade embargoes between the two countries."
 
 
 22
 Applying New York contract law, we have previously determined that a perfectly legitimate contract may be rendered unenforceable by its "direct connection" with an illegal transaction. See Bankers Trust Co. v. Litton Sys., 599 F.2d 488, 491 (2d Cir.1979) (citing McConnell v. Commonwealth Pictures Corp., 7 N.Y.2d 465, 166 N.E.2d 494, 199 N.Y.S.2d 483 (1960)). While Bankers Trust involved New York's public policy against commercial bribery, we see no reason for a different rule where the public policy is that of the federal government. Thus, even assuming that, viewed in isolation, the contracts underlying its claims are legal, NPC is nonetheless prohibited from enforcing those agreements in a United States court because they are admittedly part and parcel of a larger plan to violate the United States trade embargo.
 
 
 23
 B. In Pari Delicto.
 
 
 24
 NPC further claims to have raised a genuine issue of material fact with regard to its assertion that it was unaware of the illegal origin of the cargo. This ignorance, says NPC, permits it to enforce the contract, notwithstanding any illegality, because NPC was not in pari delicto with those who intentionally violated the trade embargo. We will postulate that NPC might be entitled to enforce the contracts if it had been truly unaware of the illegality. Cf. In re Leasing Consultants, Inc., 592 F.2d 103, 110-11 (2d Cir.1979) (bankruptcy trustee could recover the firm's payment to influence a Congressman because its creditors were "not alleged to have been involved in the illegal payment in any way"). NPC has failed, however, to raise a genuine issue with respect to its claimed ignorance.
 
 
 25
 As the district court recognized, NPC admitted in its complaint that Monnris Enterprises acted as NPC's agent in securing the chemicals from Rotex. Further, Bakhtiari's statement in the German proceedings acknowledged that during the embargo, NPC was forced to "work through agents and middle men." Mohamed's affidavit in the German litigation made clear that Monnris' role in the transaction at issue resulted from its seeking precisely such a "middle man" role in the circumstances posed by trade embargoes against Iran.
 
 
 26
 Contending that its admission of agency in its complaint is not conclusive, NPC points out that "Monnris posted letters of credit in its own name to purchase the cargo from Formula and issued a performance bond in its own name to NPC," and argues that such conduct disproves an agency relationship by demonstrating that Monnris was an independent contractor. The crucial element of an agency relationship, however, "is that the agent acts subject to the principal's direction and control." In re Shulman Transp. Enters., 744 F.2d 293, 295 (2d Cir.1984); see also National Union Fire Ins. Co. v. Turtur, 892 F.2d 199, 207 n. 5 (2d Cir.1989). "[A]n independent contractor, one who is not subject to the right of another to control his physical conduct in the performance of his undertaking, may or may not be an agent." Columbia Broadcasting Sys. v. Stokeley-Van Camp, Inc., 522 F.2d 369, 375 (2d Cir.1975) (footnote omitted); see also Anchor Sav. Bank v. Zenith Mortgage Co., 634 F.2d 704, 706 n. 2 (2d Cir.1980) (citing Columbia Broadcasting ); Restatement (Second) of Agency Sec. 2(3) (1958). There can be little doubt on this record that with respect to the transaction at issue, Monnris acted subject to the direction and control of NPC. Thus, the evidence to which NPC directs us does not contradict its admission as to Monnris' agency.
 
 
 27
 Mohamed unequivocally states that he was told on August 21, 1980 that the chemicals at issue in this case were being shipped from the United States. Thus, Monnris, NPC's agent, knew of the illegal nature of the transaction--that goods were being shipped from the United States to Iran. This knowledge is attributable to NPC, because "[i]t is a basic tenet of the law of agency that the knowledge of an agent ... is imputed to the principal." Mallis v. Bankers Trust Co., 717 F.2d 683, 689 n. 9 (2d Cir.1983); see generally Restatement (Second) of Agency Sec. 272 (1958).
 
 
 28
 Finally, Bakhtiari's affidavit in the German proceedings established that "third party bills" of the precise sort utilized in this transaction "were to be acceptable ... in order to avoid any regulations giving effect to the economic sanctions." Thus, not only was the knowledge of NPC's agent, Monnris, as to the illegality of the shipment attributable to NPC as a matter of law; the illegal shipment was part and parcel of a prior, agreed course of conduct designed to circumvent the embargo imposed by the United States. In sum, the district court correctly ruled that there was no genuine issue of fact whether NPC was in pari delicto as to the Stolt Sheaf shipment.
 
 
 29
 C. NPC's Postjudgment Motion.
 
 
 30
 Finally, NPC asserts that the district court abused its discretion by denying NPC's motion to vacate the summary judgment on the ground of mistake and to amend its complaint to withdraw its admission as to Monnris' agency.
 
 
 31
 A motion to vacate a judgment under Fed.R.Civ.P. 60(b) is addressed to the sound discretion of the trial court, whose disposition of the motion will not be disturbed on appeal absent an abuse of that discretion. See Weissmann v. Freeman, 868 F.2d 1313, 1326 (2d Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989); International Controls Corp. v. Vesco, 556 F.2d 665, 670-71 (2d Cir.1977), cert. denied, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 758 (1978); Altman v. Connally, 456 F.2d 1114, 1116 (2d Cir.1972) (per curiam). NPC invoked the provision of rule 60(b)(1) which authorizes the court to vacate a judgment on the ground of mistake. The only "mistake" that NPC offered, however, was an assertedly erroneous application of the summary judgment standard by the district court. Since we have already concluded that summary judgment was properly granted, it follows that there was no abuse of discretion in denying the subsequent rule 60(b) motion.
 
 
 32
 NPC's claimed right to amend its complaint is equally without substance. It has been held that "once judgment is entered the filing of an amended complaint is not permissible until judgment is set aside or vacated pursuant to Fed.R.Civ.P. 59(e) or 60(b)." Cooper v. Shumway, 780 F.2d 27, 29 (10th Cir.1985); see also Mitsubishi Aircraft Int'l v. Brady, 780 F.2d 1199, 1203 (5th Cir.1986) ("by the time the motion to amend was filed, there was no longer existent a claim to be amended, since summary judgment was already granted"); cf. State Trading Corp. of India v. Assuranceforeningen Skuld, 921 F.2d 409, 418 (2d Cir.1990) ("When the moving party has had an opportunity to assert the amendment earlier, but has waited until after judgment before requesting leave, a court may exercise its discretion more exactingly."); Twohy v. First Nat'l Bank, 758 F.2d 1185, 1196 (7th Cir.1985) ("Several courts have recognized that justice may require something less in post-judgment situations than in pre-judgment situations under Rule 15(a)"). The merit of this approach is that "[t]o hold otherwise would enable the liberal amendment policy of Rule 15(a) to be employed in a way that is contrary to the philosophy favoring finality of judgments and the expeditious termination of litigation." 6 C. Wright & A. Miller, Federal Practice and Procedure Sec. 1489, at 694 (1990).
 
 
 33
 We agree. Unless there is a valid basis to vacate the previously entered judgment, it would be contradictory to entertain a motion to amend the complaint. Of course, in view of the provision in rule 15(a) that "leave [to amend] shall be freely given when justice so requires," see Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962), it might be appropriate in a proper case to take into account the nature of the proposed amendment in deciding whether to vacate the previously entered judgment. Here, however, NPC belatedly seeks to amend its complaint to withdraw its admission therein of an agency that is abundantly supported in the record. The district court properly denied the application to amend.
 
 Conclusion
 
 34
 The judgment of the district court is affirmed, as is its denial of NPC's postjudgment motion.
 
 
 
 [1]
 In response to the United States embargo, Iran had outlawed the purchase of American products. See NPC II, 722 F.Supp. at 55 n. 2